THE STATE v. SCHMIDT.

1. **Criminal Evidence:** MURDER: RES GESTÆ.  On a trial for the murder of a woman by shooting, where the woman's husband and a stranger, sleeping in the same room, were also shot at about the same time, and there was an attempt to burn the house by a fire started in another room, the state was allowed to prove that, soon after the shooting, the husband addressed a person in the room where the fire was thus: "Henry, you d—n son of a b—h, you are going to burn us all up," Henry being the Christian name of the defendant, and defendant having also been recognized at the same time, as shown by the evidence, by the stranger who had been sleeping in the room.  *Held* that the declaration was properly admitted as a part of the *res gestæ.*  (See opinion for authorities.)

2. ———: ———: DYING DECLARATIONS: FOUNDATION FOR: HOW LAID.  Before the dying declarations of one alleged to have been murdered can be admitted as such, it must be shown that the declarations were made when the person making them had a belief, amounting to a conviction, that he was soon to die, and such belief may be proved by the express words of the declarant, or inferred from his evident danger, or the opinion of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which may be resorted to, in order to ascertain the state of the declarant's mind.  And in this case, *held* that declarations made four days before the death of the declarant were properly admitted as dying declarations; and the fact that they were in part oral, and in part reduced to writing, was not material.

3. ———: ———: ———: WEIGHT OF.  Dying declarations are entitled to the same consideration as if given under oath; and an instruction designed to lead the jury to conclude that they are entitled to less consideration was properly refused.

*Appeal from Fayette District Court* — HON. L. O. HATCH, Judge.

THURSDAY, DECEMBER 15.

INDICTMENT charging that the defendant unlawfully, willfully, deliberately, and with malice aforethought, did kill and murder Lucretia Peek.  Trial by jury, who found the following verdict: " We, the jury, find the defendant guilty of murder in the first degree, and we say that his punishment shall be death."  Judgment that the defendant, " Henry Schmidt,

be punished by death, and that the judgment be executed by hanging the defendant, Henry Schmidt, according to law, on the first Wednesday of January, 1888." From this judgment defendant appeals.

*Samuel Murdock,* for appellant.

*A. J. Baker, Attorney-general,* for the State.

SEEVERS, J.—The deceased was the wife of Abram Peek. They resided on a farm, and their homestead consisted of a sitting-room, bed-room and kitchen. There is a door between the sitting-room and bed-room. On the night of the 4th day of September, 1886, there were two beds in the bed-room, one in the northeast, and the other in the northwest, corner of the room. Near the latter was a window. On said night there were in the house Mr. and Mrs. Peek and Abram Leonard. They went to bed between 9 and 10 o'clock. Leonard slept in the bed in the northwest corner of the room, and Mr. and Mrs. Peek in the other. Some time in the night, and while Leonard was sleeping, there was a pistol shot, and he was struck by a ball, and another ball passed probably within an inch of him. He remained still for a minute or two, then got up, but before he did so he said, " I am shot." Mr. and Mrs. Peek got up before he did. A shot then came in the west window, and Mrs. Peek said, "I am shot," and Mr. Peek said, "I am shot." A fire was started in the sitting-room. Mr. Peek rushed out and said: "Henry, you d—n son of a b—h, you are going to burn us all up." Leonard could see in the sitting-room, and he saw the defendant standing by the partition, and said, " Henry, I see you plainly." When Peek rushed out he told Leonard to hold the door, and he said, "I will put out the fire." Mr. Peek did not return to the house. Leonard and Mrs. Peek remained in the house until morning, when he aroused the neighbors. The foregoing is, in substance, the evidence of Leonard, who was, then 72 years old.

The evidence also tended to show that a fire had been started in the sitting-room, and that it was extinguished after Mr. Peek left the bed-room. The body of Mr. Peek was found the next morning not far from the house, and the evidence tended to show that the skull was fractured, and it was produced by a blunt instrument, and this was the cause of his death. The deceased was shot in the right cheek. There were powder marks all over her face. She died on the 20th day of September, 1886. A *post-mortem* examination was held, and a bullet was found in the right side of the brain. The gunshot wound caused her death. The foregoing facts were in no respect. controverted, except that it is claimed that the declarations made by Mrs. Peek were inadmissible.

The only material controverted question was as to whether the defendant was the person who fired the pistol shot which caused the death of Mrs. Peek. Evidence was introduced tending to show that the defendant was at the house on the night in question, which we have not deemed it necessary to set out. A few days prior to the death of Mr. Peek, the defendant, in speaking of him, said: " God damn him! if he don't pay me I'll kill him." A few days before her death, Mrs. Peek made a statement, which was reduced to writing and signed by her. It is as follows. The portion italicized was stricken out by the court, and the residue only was admitted in evidence:

" WINDSOR, September, 16, 1886.

" Feeling poorly, I make this statement concerning the shooting of Mr. Leonard, Mr. Peek and myself. *On, or about the night of the 4th of September, 1886, Mr. Leonard and Mr. Peek had been in town, (West Union,) on business, getting home about sundown. Being late after supper, we persuaded Mr. Leonard to stop over night. Mr. Leonard slept in the same room with Mr. Peek and myself. Mr. Leonard slept in the west bed next to the window; head to the west. Mr. Peek and I slept in the east bed; head to the north. There was a curtain between the two beds.* About 11 o'clock

we were startled by a shot, and Mr. Leonard said, ' O, I am shot!' and then he turned and shot Mr. Peek, and then we shut the door.   Mr. Peek said: ' For God's sake, woman, what will we do?   We are in here without anything to defend ourselves.   If we stay in here, we will be burned up; and if we go out we will be killed.'   I told Mr. Peek I would rouse the neighborhood.   He said, ' My good woman, if you go out, he will kill you.'   I said, I will go out of the window, and go up to Mr. Swails, and tell him.   When I stuck my head out of the window he shot me.   I said to him: ' Henry how could you hurt me?'   He said, ' I didn't mean to hurt you, Mrs. Peek.'                    LUCRETIA PEEK."

She also said that the person who inflicted the wounds on her was " Henry Schmidt, the boy who worked for us."   To the introduction of the written statement and oral declaration of Mrs. Peek, counsel for the defendant objected, on the ground that it was not shown that they were made under the belief that she soon expected to die.   The objections were overruled.

I.   It is insisted by counsel for the defendant that the court erred in admitting what was said by Mr. Peek when he

1. CRIMINAL evidence : murder: res gestæ.

opened the door between the sitting-room and bed-room.   What he then said tended to show that he then recognized the defendant.   The attorney-general insists that what Mr. Peek then said was *res gestæ*, or a part of the transaction, and therefore the evidence was admissible.

What length of time had elapsed after Mrs. Peek was shot before the door was opened and the declaration made does not certainly appear; but it could have been but a few moments. Several pistol shots had been fired, and all of the persons in the house declared they were shot.   A fire had been lighted in the adjoining room, and the danger of being burned existed when the door was opened and the declaration made.   It seems to us quite clear that the declaration constitutes a part of the transaction, and was clearly admissible in evidence.   It is

true, the pistol shots had been fired a short time before, but the fire was then burning. The danger of being burned actually existed at that time, and the declaration was made in reference to that fact. In *Com. v. McPike*, 3 Cush., 181, the deceased ran from a room where her husband, the defendant, was, to a room in the same house, a story above the one occupied by herself and husband, and knocked at the door, crying "Murder!" A witness saw the deceased was wounded, and started for a physician. She met the defendant and another witness on the stairs, and the latter went for a watchman, and, upon returning, went immediately to the room where the deceased was, and there found her bleeding profusely. She said John (meaning defendant) had stabbed her. The defendant objected to such declaration. The objection was overruled, and it was held that the ruling was right, on the ground that it was so recent after the receiving of the injury as to justify the admission of the evidence as a part of the *res gestæ*. (See also, *Driscoll v. People*, 47 Mich., 413; S. C. 11 N. W. Rep., 221; *People v. Vernon*, 35 Cal. 49; *Harriman v. Stowe*, 57 Mo., 93; *Travelers' Insurance Co. v. Mosley*, 8 Wall., 397; *State v. Driscoll*, 72 Iowa, 583.) The declaration was admissible in evidence, and therefore, the court rightly refused the following instruction asked by the defendant: "It has been testified to that Mr. Peek said in his house, at or about the time the shooting took place: 'Henry, you d——n son of a b——h, you are going to burn us all up.' You are not to consider these words as tending to show that the defendant was present at the shooting, or that he shot Mrs. Peek." As the evidence was admissible, it follows that it should be considered by the jury. It is true that the declaration does not certainly indicate that Mr. Peek meant the defendant. He simply designated the person as "Henry." The defendant's Christian name is Henry. This fact, and other evidence in the case, without the semblance of a doubt, was sufficient to warrant the jury in finding that Mr. Peek meant the defendant. The fact that Mr. Leonard

saw the defendant at the same time, when his opportunities for recognizing him were not as good as Mr. Peek's, renders it certain beyond a reasonable doubt that the latter also at the time knew and recognized the defendant.

II. The settled rule as to the admission of dying declartions is that evidence must be introduced showing that such

*2. ——: ——: dying declaration: foundation for: how laid.* declarations were made at a time when the declarant expected to soon die. This must amount to a conviction. A mere transient or fleeting impression, it will be conceded, is not sufficient. It is the province of the court to determine when this has been sufficiently established. Mrs. Peek was the mother of three sons, named. John, Fred and Frank Beeker, who were with her almost constantly after she was shot until she died, and Frank testified that she said, on the 6th day of September, that "she was getting very weak, and knew she must die." "The day before she died she said: 'I am feeling very bad, Frank. Am growing weaker all the time. I know I am dying, and must go.' We encouraged her all we could. She said, 'No, it's of no use. I know I must die.'" Fred testified that "she seemed despondent and positive she was going to die. She seemed to think she had no longer to stay with us. We told her to cheer up ; that perhaps she would recover. She said, 'No, children, don't think I can live.' We told her not to give up in that way; try and stay with us. She said she was growing weaker all the time, and knew she could not live much longer. John spoke to her, and said she ought to pray. She said, 'I do pray, John.'" John testified: "My brother Frank said, 'Ma, how are you feeling this morning?' She said, 'I am feeling very poorly. I know I must die.' We told her to cheer up; she might get better. She said, 'Yes, I would like to live; but I know I must die.' She said she heard beautiful music, and 'am getting weaker all the time.'" The physician that was attending the deceased informed her that such a wound was frequently serious; but he did not inform her it was necessarily fatal.

It clearly appears from the evidence that the deceased never rallied from the shock produced by the pistol shot. At no time did she express the belief or hope that she would get well; but at all times when she gave expression to her belief on the subject she said she could not live, and that she would die. At times the deceased was delirious to some extent. Her condition was of a comatose character; but she knew and recognized the persons present, and expressed herself usually in a rational manner, and seemed to comprehend what she said, and her condition and the character of the wound would naturally cause any person to entertain aprehensions that it would prove fatal. We feel constrained to say that the declarations were admissible in evidence; for it is sufficient if it satisfactorially appears that they were made " under a sense of impending death," whether it be proved by the express words of the declarant, or inferred from his evident danger, or the opinion of the medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which may be resorted to in order to ascertain the state of declarant's mind.

The length of time which elapsed between the declarations and the declarant's death furnishes no rule for the admission or rejection of the evidence, though, in the absence of any better evidence, it may serve as one of the exponents of the deceased's belief that his dissolution was or was not impending. (1 Greenl. Ev., § 158.) In this case there are the express words of the deceased that she expected to die, and the character of the wound, and other circumstances, which clearly indicate that such must have been the belief of the deceased. The fact that a part of the declaration was reduced to writing, signed by the deceased, and other declarations established by parol, is not a valid objection to the admission of the evidence. (1 Greenl. Ev., § 161.)

III. The court instructed the jury that the " dying declarations of Mrs. Peek are in evidence in the case, entitled to the same consideration as if given under oath, and no greater," and the defendant asked the court to instruct the jury as follows: " In considering the

3. ——:——:—— weight of.

dying declarations of Mrs. Peek, you will take into consideration the fact that they were not made under oath, and that she was not subject to cross-examination; and she states that she met the defendant, and conversed with him, immediately after the wound from which she died was inflicted." This instruction was refused. The ground on which declarations are deemed admissible in evidence is " that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice." It therefore follows that the instruction given by the court is clearly correct. No authority has been cited which sustains the instruction asked. No rule or principle of law is therein enunciated. It simply states what every juror of ordinary understanding would recognize without any direction from the court. If the instruction had been given, it would not have constituted error, and we think it equally clear that it was not error to refuse it. If it had been given, it is apparent, we think, that it would not have benefited the defendant. But, as we have said, it announced no rule of law, but, at most, simply stated a fact.

We have examined this case with the care its importance demands, and the evidence fully sustains the verdict. We have been unable to find any error in the record, and therefore the judgment of the district court must be

AFFIRMED.