STATE OF IOWA v. SARAH KUHN, Appellant.

Murder by Poison: EVIDENCE SUSTAINS CONVICTION. Evidence on a prosecution for murder by poison, in which the defense was decedent's suicide, considererd, and *held* sufficient to sustain 1 a verdict of murder in the first degree.

EVIDENCE: *Declarations of decedent to rebut suicide.* Declarations by a husband, who had been poisoned, death occuring shortly after the poison was taken, that he was dying, that 2 "She poisoned me," and "She did it; yes, sir, she did it," —were admissible on a prosecution for murder to rebut the theory of suicide.

*Dying declarations.* A dying declaration that "She poisoned 2 me" was not objectionable as being a conclusion, and not a 4 fact.

*Whether dying declarations was for court.* The question as to whether these statements were admissible as dying declarations 5 tions to show the cause of death was for the court to determine.

*Exclusion when no offer of proof is made,* A witness for the defense on a prosecution for murder was asked as to what defendant and deceased had said in his presence, but was not permitted 6 to answer. *Held* that, as the questions did not disclose the answers sought, and no offer of proof was made, it was not error to reject them.

*Harmless exclusion.* Under Code, section 5462, which provides that on appeal technical errors which do not affect the rights of the parties shall not be considered, the exclusion of the evi-

6   dence which, if favorable, would not have aided defendant's case, was harmless error.

*Scope of cross-examination of defendant.* Under Code, section 5485, which provides that the cross-examination of the defendant on a criminal prosecution shall be strictly confined to the matter testified to, it was not error to permit the state to cross-examine the defendant, who was accused of murdering

7   her husband, as to her relations with another man, such examination being permissible to show the character of the defendant, to develop a motive for the crime, and to contradict other evidence.

*Motive.* On prosecution for murder it was not error to admit evidence of a will made by decedent, giving all his personal

3   property to defendant, to prove a motive for the crime.

**Review on Appeal:** *Instruction too favorable to appellant.* On a prosecution for murder an instruction was given that if the deceased had stated in the presence and hearing of defendant, just before he died, that defendant had poisoned him, it was proper to consider the acts and conduct of defendant at that time, but the court failed to charge that such statements were

8   also admissible for other purposes. *Held* that, as the error in the instruction was in defendant's favor, it was not prejudicial to her. Weaver, J., dissenting.

*Appeal from Keokuk District Court.*—HON. W. G. CLEMENTS, Judge.

WEDNESDAY, MAY 28, 1902.

DEFENDANT was accused and convicted of the crime of murder in the first degree. In substance, the indictment charges that she willfully administered strychnine poison to her husband, Charles Kuhn, from the effects of which he died on the 4th day of September of the year 1900. From a judgment of life imprisonment in the penitentiary, defendant appeals.—*Affirmed.*

*C. H. Mackey, D. W. Hamilton*, and *C. W. Brown* for appellant.

*Chas. W. Mullan*, Attorney General, *Chas. A. Van Vleck*, Assistant Attorney General and *B. W. Preston* for the State.

WATERMAN, J.—One contention of appellant, and perhaps the principal one, is that the evidence does not justify the verdict. As a knowledge of the facts is necessary to an understanding of the other matters presented, we shall in the outset give the case as we find it in the record.

Defendant and Charles Kuhn were married on the 30th day of May of the year of his death. She was 19 years of age; he was 24 years her senior, and permanently crippled in one arm and hand and in both legs. He was a shoemaker, living and pursuing his avocation in the town of Delta. They had been acquainted for about a year previous to their marriage, but the testimony of defendant does not disclose that this acquaintanceship was at all intimate, for, though pressed upon the point by counsel for the state, she tells of but few, if any, acts of courtship on his part. However, they were married. That it was a loveless union, the bonds of which rested heavily upon her, is sufficiently shown by defendant's own testimony. After marriage they took up their residence in Delta. The evidence discloses no event of their married life of any significance until about the 1st of August, when husband and wife appeared in an attorney's office in Sigourney, where he procured to be drawn, and there executed, a will giving to her all of his property. This will was read aloud in defendant's presence. In order that what follows shall be fully understood, it may be here said, that Charles Kuln, in addition to his other physical disabilities, was impotent, but from what cause is not disclosed. On the 6th day of August defendant had, as testified to by

a neighbor, an interview of much meaning with a young man named Andrew Smith. That its full import may appear, and the veracity of this witness be supported,—for she is contradicted by defendant as to some parts of the conversation,—it is necessary to digress, and gather from the record what we can as to defendant's relations with Smith prior to her marriage. That these were somewhat intimate is shown by Smith's father, who testifies that his son "kept company" with her. They were employed together in a railway camp at one time for some three months. The precise location of this camp defendant does not give, but it seems from what she says to have been somewhere in the vicinity of Ames, in this state. When defendant left her home at or near What Cheer to go there, it was in a buggy alone with Smith, and to get a train, which she well might have taken on a direct line to Ames at What Cheer. They made a long and mysterious drive. We say "mysterious" because defendant is loath, when questioned, as she was, to tell anything of it. She was apparently unwilling to say where they went, or how far, but it appears they drove at least to the Iowa Central Railway, which is some 20 miles from What Cheer. That this was not to obtain free transportation on that line is clear, for defendant says she purchased a ticket. These facts, with those we are now to relate, evidence quite a close intimacy between these parties before her marriage. Returning now to the interview: Defendant and Smith were in the barn of the latter's father. She was crying, and said, "Oh Andy, I can't live with him any longer. There had [has] to be something done." He said: "You mustn't talk that way. You are worryng about me, but I will take care of myself." She then said she had tried to get him to divide his property, but he would not do it. The fact of this meeting, and that defendant was crying, is testified to also by another witness. That her husband was the third person referred to is practically admitted by defendant

in her statement of what took place on this occasion. Defendant admits this interview, but denies the statements attributed to her, and says: "I complained of a pain in my stomach, and said I couldn't stand it any longer. I wished him to talk to Charley [her husband], and get him to get me some medicine. That was the only time Charley Kuhn ever refused to get me anything." There are three defects in defendant's version of this conversation: First. It does not appear the pain she suffered was a sudden paroxysm. It had been of some duration, for she had spoken to her husband about it; yet she admits it had not interfered with her ordinary duties, for she says she had been making a dress for a neighbor, and was on her way home from delivering it, when she met Smith, and, as she stated, broke down in his presence under her physical ailment, and gave utterance to the despairing exclamation we have mentioned. Second. She gives no reason why she sought this young man out to act as intercessor with her husband, and to be the confidant of her marital woes; and there is no reason, unless it be there was that feeling in her heart for him, which, if she were an honest woman, would have been forever obliterated when she spoke her marriage vows. Third. What she says of her husband's conduct illy accords with her testimony at the inquest held upon his body, when she said there was no trouble between them. "We were happy and contented," was her statement. Defendant, near this time, was seen to have other meetings with Smith, but their conversation is not disclosed. Kuhn's death occurred on a Tuesday. On the Saturday next preceeding there was trouble between defendant and her husband, which she tells of in this way: "On that night I wanted him to answer me one question. * * * I asked him this: 'What made you marry any woman when you knew you could not do family duties?' And he would not answer me. I sat there and waited, and then I said: 'Charley, are you going to answer me? Will

you please answer me? Will you please give me some reason why you cannot answer?' He got up, and went to the door, and said, 'This will never do.' He started out of the door, and went toward the barn, and fetched Hiram Smith over. I called three times when he would not answer me; and again I said, 'I feel like going right away, and going and staying with my sister, if you cannot answer me.' * * * He did not answer me, and then fetched Hiram Smith over, and told him to talk to me. He talked to me. He wanted to know what the fuss was over. He was told what the trouble was.'' We have no means of knowing just the character of this difficulty except from the wife's statement; but, taking that we must conclude it was graver in its nature, though identical in language with what she admits. She was complaining of a great wrong he had done her, but, according to her story, wanted no reparation, no satisfaction, but only his reason for doing it. What reason could this man give for marrying her when he was unable to make her really his wife, that would have been any solace to her wounded feelings, or any gratification of the passion so admittedly felt? There was some cause, which she does not give, that induced the husband to call in the aid of a neighbor.

This was the situation on the eve of the tragedy, and it discloses beyond question a motive on the wife's part for the taking of her husband's life. There was the motive of gain through his will, and also of release from marriage ties, which, if ever sacred, had become burdensome to her. We now reach the events immediately surrounding Kuhn's death. On the evening of September 4th husband and wife started for the town of What Cheer, some seven miles distant from Delta. They went for a drive, and, as the wife knew, to get some beer. They were in a top buggy, drawn by a single horse. When they reached a certain street in What Cheer, defendant alighted, and remained upon the walk while her husband went something more

than a block distant to a saloon, and purchased a dozen bottles of beer. These bottles were securely corked and wired, and they were placed in the back of the buggy. The husband then returned, took his wife in, and they started for home. After getting well out of the town, Kuhn said he wanted some bologna sausage, turned his horse, and went back to get it. Before the coroner's jury defendant testified that they drove to a butcher's, and she sat in the buggy and held the horse, while her husband went in and made the purchase. On the trial she changed this, and said that her husband did not want her to stay in the buggy, as there were many strange men on the street, so he took her to the railway depot, which is on the same street, and but a short distance from the butcher's place. There she waited some 25 minutes, and when he came back with the bologna sausage she took her place beside him, and they again started to return home. This discrepancy in her evidence throws some incidental light upon the tragedy. Her present statement evinces a singular precaution on her husband's part, for he had left her wholly alone on the street a short time before when he went to get the beer; and then, to protect her from strange men, left her alone at the depot in the heart of the town, when, if she had remained in the buggy, she would have been within his sight and protection during the whole time. We know defendant is not claiming consistency for this act of Kuhn, but insists it was done in order that he might have an opportunity to poison the beer. The point we make is this: His action in leaving her at the depot, if he did, was so singular that it must have attracted her attention. In the light of subsequent events, she could not have forgotten it, or failed to allow it proper weight in the occurrences of that tragic night. There is one way of accounting for the change in defendant's story. Her first statement could hardly have been a mistake, but it was made before any theory of defense had been evolved.

When it was decided to charge Kuhn with suicide, it became material to give him an opportunity to poison the beer which he intended to drink. With the exception of circumstances to which we shall call attention hereafter, we have only defendant's story as to what happened on the return trip until the town of Delta was reached. The sausage, which was shared, was eaten, and one bottle of beer that Kuhn took from the back of the buggy was drunk by the two. After eating the sausage, Kuhn complained of a pain in his stomach. A little later he reached down in front of the buggy seat, and got a second bottle of beer. Whether this bottle was wrapped in blue paper and corked, or how it was opened, defendant is unable to say, though she is at no loss to tell these facts with relation to the first bottle, nor does she give any reason for this fault of observation. The first bottle, she says, foamed when it was opened; the other did not. Kuhn drank about half the contents of the second bottle, and handed it to her, saying, "Taste how bitter it is, but it feels good going down." She drank a small quantity, perhaps half of a full glass,— it was very bitter,—and handed the bottle back to her husband, who finished it. The last beer was consumed about 3½ miles from Delta. Just on the northern edge of that town lived Wesley Snider. Between 9 and 10 o'clock of this evening he was aroused and called to the roadside by a man's voice calling for help. This was followed by a woman's cries also. The man and woman were Kuhn and his wife. As Snider went out, she said, "Come quick, my husband is dying." Kuhn also exclaimed that he was dying, and, referring to his wife, said, "She poisoned me, Snider," and to an expression of disbelief by Snider responded, "She did it; yes sir, she did." Defendant denied the charge, and said: "I don't know what makes Charley talk so. What would people think?" She also told Snider she did not know what was the matter with her husband; that he had been drinking beer and eating

bologna. Kuhn seemed in great distress, and asked Snider to get in, and drive at once to a doctor. This Snider did, standing in the buggy, driving with one hand, while he held Kuhn with the other. During this drive Kuhn repeated his statement that his wife had poisoned him, and he was dying, and in one instance turned to her and asked, "Why did you do it?" Some of these declalations were heard by other witnesses than Snider. Kuhn had several spasms on the way, and by the time a physician was found, which was at the third place they called, and after a drive of about a mile, he was unconscious, and in such a state of collapse that the physician did not attempt to relieve him, but ordered him taken home. This was done. He was carried from the buggy into his house, and, if not then dead, was so within a few minutes afterwards. The testimony of the physicians is that Kuhn's symptoms were those of strychnine poisoning. Strychnine was found in his stomach and liver and in what little remained of the contents of one of the beer bottles. That he died from the effects of that poison cannot be doubted. Neither is it a subject of dispute that the poison was taken in the second bottle of beer drank. This beer was harmless when the bottle was placed in defendant's hands, for she suffered no ill consequences from what she drank. When she passed the bottle back to her husband, it contained a deadly poison.

We have, then, this situation: If Charles Kuhn did not commit suicide, murder was done, and defendant must be the guilty party. The theory of suicide is rebutted, we think, by these facts: When he started for What Cheer on this fateful evening, Kuhn was "happy and jolly," as his wife says. He purchased beer enough to last him for some days, thus making provision for the future. If he committed suicide, he also attempted the murder of his wife, and for the latter crime no possible motive is disclosed. But over and above these facts are his solemn declarations,

made in the defendant's presence, and when declarant was in the agony of death, which were denials of any such act. The evidence of these statements was objected to, and error is predicated on the court's instruction submitting such matters to the jury. We shall have occasion to consider this instruction further on. It is enough to say now that these declarations were admissible, being made in defendant's presence, and might be given effect as denials of voluntary self-destruction on the ground they were a part of the res gestæ. Greenl. Evidence, section 108; State v. Jones, 64 Iowa, 349; State v. Vincent, 24 Iowa, 570; State v. Porter, 34 Iowa, 131; State v. Schmidt, 73 Iowa, 469; People v. Simpson, 48 Mich. 474 (12 N. W. Rep. 662). Declarations so made are admissible for more than we now accord them, as we expect to show hereafter. We care at present only to consider them as rebutting the theory of suicide. Perhaps when this is done we might safely stop, for, as we have said, if this was not a suicide, it was murder, and only the wife could have committed it. But the case is stronger than this. There is some testimony which we have not yet given. With the facts to which we have referred going to disprove suicide, we turn now to some matters not previously mentioned, which affirmatively indicate murder. On the morning after Kuhn's death there was picked up on the east side of the What Cheer-Delta road, near the point where defendant says the second bottle of beer was finished, a little vial, labeled, "Poison—Strychnia," and containing a small quantity of that drug. The defendant sat upon that side of the buggy on the homeward trip. A short distance back of this place,—that is, towards What Cheer,—and on the opposite side of the road, was found a piece of blue paper, such as that in which each of the bottles of beer was wrapped when they were placed in the buggy. It is said that Delta is a prohibition town, and it is no uncommon

thing to find the blue wrappers of beer bottles along the highway between that place and What Cheer, but there is no claim that the bottle containing strychnine poison was not an unusual thing to find in the road. There is no direct evidence that this bottle was ever in the possession of defendant, but it is a remarkable circumstance, and entitled to great weight in determining her guilt, that it was found at this particular point, and on the side of the road where it would be if defendant dropped it from the buggy, and that it contained the same kind of poison as that which caused Kuhn's death.. Surely, if Kuhn poisoned the bottle of beer in What Cheer, he never carried the vial from which he obtained the strychnine half of the way to his home, and then threw it across the buggy, past his wife, to the opposite side of the road to that on which he was riding. Some crystals of the poison were undissolved in the beer bottle when the little remaining of its contents were analyzed by a chemist, thus indicating that either a large amount of poison was used or the quantity of liquor was not great when the poison was put in. If Kuhn drank a part of the beer before handing the bottle to defendant, as she says was the case, and she then introduced the poison, as she had an opportunity to do, the reason why some particles were not taken in solution is easy to understand. Again, on the theory of the defense, how are the wife's statements to Snider to be reconciled? She told him she did not know what was the matter with her husband. He was insisting that he was poisoned. If she had drunk of this poisoned beer, she would have known something was wrong with it, and naturally would have connected it with his terrible illness. As one witness says, strychnine is very bitter. It can be tasted in 50,000, almost 70,000, parts of water. Is it possible she drank about half a glassful of that beer, as she says, and did not think to attribute her husband's condition to it? She claims to have been ill during the night from its effects.

She did so complain at that time, but, aside from her complaints, there is no evidence she was indisposed. But these alleged complaints were, if made, not indicative of an illness on her part. Taking her story, she had drunk a considerable quantity of this poisoned beer. She knew its fatal effect in her husband's case. She became ill during the night, but never sent for a physician, never gave to her alarming condition a serious thought. This is scarcely possible. Yet, if it is not the fact, then she never drank any of the beer; her story to that effect is false; and, if false, the conclusion is irresistible that a desire to hide guilt prompted the departure from truth.

We think the facts sustain the verdict, and now proceed to take up certain other grounds of complaint. The errors assigned are so numerous we shall set out only those that involve questions of some interest to the profession, or upon which special stress is laid by counsel for defendant. The others will be disp s:d of without discussion.

I. It is thought there was error in admitting evidence in relation to the will made by Kuhn. It is always competent to prove a motive for the commission of a crime. [*State v. Pugsley*, 75 Iowa, 542; *State v. Rainsbarger*, 74 Iowa, 196,] and in cases founded upon circumstantial evidence motive is generally an essential element of the state's case. That defendant would profit by the death of her husband is admissible as bearing on the question of motive. *People v. Pope*, 108 Mich. 361 (66 N. W. Rep. 213); *Davidson v. State*, 135 Ind. Sup. 254 (34 N. E. Rep. 972); *People v. Buchanan*, 154 N. Y. 1 (39 N. E. Rep. 846.)

II. Kuhn's declarations, when *in extremis*, that his wife had poisoned him, are strenuously combated. We have already said something with relation to their admissibility as a part of the *res gestæ*. As such they were receivable for a wider purpose than we have as yet given them credit. They were for the consideration of the jury,

as tending to show the cause of death, and as a direct charge that defendant was responsible for it. *State v. Schmidt, supra*; *Com. v. McPike*, 3 Cush. 181 (50 Am. Dec. 727); *State v. Wagner*, 61 Me. 193. We might rest this matter here, for that is the only effect which could be given them as dying declarations. But as they are attacked vigorously as such, it is proper to say we consider them competent even on that ground. Dying declarations, to be admissible, must be shown to have been made under a sense of impending death. This appreciation of certain dissolution may be inferred from the conduct, condition, or statements of the declarant. *State v. Schmidt, supra*: *State v. Gillick*, 7 Iowa, 287; *State v. Nash*, 7 Iowa, 347; 1 Greenleaf Evidence, section 158. It is in evidence that one fatally poisoned with strychnine is aware, when the convulsions come on, that he is going to die. In this case that assumption is strengthened by the express declarations of Kuhn. His desire to reach a physician was doubtless only to relieve present pain. The question as to whether these statements were admissible as dying declarations was for the court. 1 Greenleaf Evidnce, section 160; *State v. Baldwin*, 79 Iowa, 714; *State v. Elliott*, 45 Iowa, 487. While they do not clearly appear to have been received as such, they well might have been. But it is said the statement, "She poisoned me," is a conclusion, and not a fact, and is inadmissible for that reason. That this is not correct, see *Liscomb v. State*, 75 Miss. 559 (23 So. Rep. 210); *Schenkenberger v. State*, — Ind. Sup. — (57 N. E. Rep. 519); *Simmons v. People*, 150 Ill. 73 (36 N. E. Rep. 1019); *Puryear v. Com*, 83 Va. 53 (1 S. E. Rep. 512). In the first of these cases it is said that any process of reasoning which seeks to distinguish between the assertions "He poisoned me" and "He shot me" is a refinement too visionary to serve in the practical administration of justice, and with this statement we agree. In *State v. Mace*, 118 N. C.

1244 (24 S. E. Rep. 798), the declaration, "He murdered me," is held admissible, and as not indicating the degree of crime. Indirectly this court has given some sanction to the same rule. *State v. Baldwin*, 79 Iowa, 714.

III.   Hiram Smith was called as a witness by the defendant and a number of questions were asked of him as to what defendant and her husband said in each other's presence on the occasion when he was called in after their difficulty. These were ruled out. Many of the questions do not disclose the answers sought, and no offer of proof was made. See *State v. Johnson*, 72 Iowa, 393. Furthermore, all of the questions were of a preliminary character. Those which indicate the responses desired would not have aided defendant's case had they been answered favorably to her. The rulings were therefore without prejudice. Section 5462, Code, forbids a reversal under such circumstances.

IV.   It is charged there was error in permitting the state to cross-examine the defendant as to her relations with Alexander Smith. This examination was evidently intended to show the character of the witness, to develop a motive for the crime, and incidentally as matter of contradiction, and for these purposes it was permissible. If it could be shown that she had an affection for Smith, and therefore regraded her marriage bonds as hateful, it must be conceded a motive would be disclosed; not an adequate motive, because that never exists for murder, but such an incentive as might impel a weak or depraved mind to the act. It is urged that section 5485 of the Code forbids the cross-examination of a criminal defendant who goes upon the witness stand as to any matters not inquired about in chief. But this court has held that with relation to his memory, history, motives, or matters affecting credibility, such witness stands upon the same footing as any other. *State v. Red*, 53 Iowa, 70; *State v. Watson*, 102 Iowa, 654; *State v. Chingren*, 105

Iowa, 172.    The cross-examination was within proper bounds.    1 Greenleaf Evidence, section 459 *et seq.*; *State v. O'Brien*, 81 Iowa, 93.    Defendant had no right to pose on the witness stand as a loving and dutiful wife if she was not entitled to that character.

V.    Instruction No. 14 of the charge given in substance tells the jury that if they find Kuhn was impotent, and that such condition tended to produce melancholia, and induce a desire to take his own life, this fact—*id est*, impotency—might be considered in determining the question whether he took his own life.    Some fault is found with the grammatical construction of the paragraph.    We set out the rule which it announced as it clearly appears to us and must have been understood by the jury.    It is contended the jury were not permitted to consider his impotency unless they first found it had produced insanity which had been manifested by some attempt at suicide.    This is a forced construction, and one which the language used will not bear.

VI.    The sixteenth paragraph of the charge given is as follows:  "If you find from the evidence that Charles Kuhn was poisoned by strychnine poison at the time that the defendant and the deceased called the witness Snider out from his house on September 4, 1900, and if you find from the evidence that after the witness Snider came to the buggy, and after he was in the buggy, the deceased declared and stated in the presence and hearing of the defendant, in substance, that the defendant had poisoned him, it is proper for you to consider the acts and conduct of the defendant at the time such declarations and statements were made by the deceased, together with all the other facts and circumstances established by the evidence, in arriving at your verdict."    Much of the complaint lodged against this instruction is answered by what we have already said.    These declarations, as part of the *res gestæ*, and as dying declarations, were

admissible for much more than the jury are here permitted to accord them. As the error in the instruction, if any, is in defendant's favor, she cannot be permitted to take advantage of it.

VII. The seventeenth instruction given relates to the matter of motive, and is manifestly misconstrued by appellant's counsel. It is unassailable.

The charge of the trial court was full and complete, covering the various issues in the case and therefore it was proper to refuse the instructions requested by defendant.

We have gone through this record carefully, examining other matters presented by appellant, but which we have not thought necessary to specially discuss. Our conclusion is that defendant had a fair trial, that the forms of law were observed, and the verdict was demanded by the facts proven.—AFFIRMED.

WEAVER, J. (dissenting).—I am profoundly convinced that the judgment appealed from in this case should not be permitted to stand. It is the most ancient and sacred principle of our law that no person shall be legally branded a felon or suffer forfeiture of life or liberty except upon the most cogent and convincing proof. No matter how grave the charge, nor how strong the suspicion under which he rests, he is entitled to go into court unburdened with any presumption of guilt, and to have every element of the alleged crime established by evidence beyond a reasonable doubt before a verdict of guilty can be justly pronounced against him. Indeed, the graver the charge, the stronger the suspicion, the more insistent the popular demand for conviction, the more careful should be the courts to see that these essential safeguards of human rights are preserved unbroken. It is natural and inevitable that a charge of murder under any circumstances in a peaceable and orderly community should arouse intense and general interest, and even where the utmost care is exercised it is difficult to wholly eliminate passion and prejudice as factors

in judicial investigation of the crime. If, then, to the charge of murder we add the element of mystery; if there be no eye witness of the act, and the crime is to be made out, and the guilty party detected by a process of reasoning or deduction from circumstances brought together from various sources, and woven into a connected fabric of proof, the difficulty of holding the scales of justice evenly is multiplied manifold. It is not my purpose to disparage circumstantial evidence. It is an essential and indispensable instrument in the administration of justice. It is nevertheless a dangerous instrument, which, if not wisely and conservatively applied, may easily work the grossest injustice. The importance of detecting crime and punishing criminals is not to be overlooked, but it is of no less importance that no person shall be convicted or punished upon anything less than the full measure of proof required by the established rules of law. Carefully reading the majority opinion in the light of the entire record and giving it that earnest and respectful consideration which it justly deserves, I am forced to the conclusion that it violates the fundamental principles to which I have above adverted, and that appellant is to stand convicted of murder upon evidence which, when given its strongest probative effect, may justify suspicion, but falls deplorably short of proof of crime.

I. The evidence is insufficient to support the verdict. Conceding the perfect sincerity of the majority opinion, and the strength of the argument by which it is sought to be justified, I must still insist that in many respects the recitation of the evidence therein set forth does not fairly reflect the record as I read it, and that the inferences drawn from proved or conceded facts are often forced and unnatural. The framework of the case as made by the state and upheld by the majority may be stated as follows: (1) That defendant was unhappy in her married life, and, being also the beneficiary of her husband's will, had a

double motive for his murder; (2) that the husband died of strychnine poisoning; (3) that defendant had an opportunity to administer the poison; and (4) that the husband just before his death accused defendant of the crime. Every so-called incriminating fact and circumstance disclosed upon the trial clusters about these four propositions. Beyond them there is nothing, and, though we were to concede that each of these propositions has been clearly established, the case still lacks material elements which must exist in order to warrant the state in demanding a conviction. But even this concession cannot properly be made. Though not shown with absolute certainty, it may well be admitted that the jury were justified in finding that Charles Kuhn died of strychnine poisoning. When we pass that point the testimony leaves the investigator entirely at sea. Let us look, for instance, to the alleged motive. Where, as in this case, the prosecution rests entirely upon circumstantial evidence, this is a question of much importance. The absence of motive does not necessarily negative guilt, but the rule that no sane man commits murder without some motive therefor is so nearly universal that, if none be discovered, it is hardly possible to produce a combination of circumstances strong enough to impress the impartial mind with a conviction of the guilt of the accused. More than that, to produce a belief of criminal motive something more must appear than the naked fact that the accused has a financial interest in the estate of the deceased. To say that such interest in itself affords ground of suspicion is to cast the shadow of crime over every household, and plant the seeds of fear and distrust in the most sacred relationships of life. To be worthy of serious consideration, there must appear not only prospective financial advantage in the death of another, but there must also be something which tends to show that criminal covetousness has taken possession of the heart of the accused. Speaking upon this subject,

one of the most eminent writers upon the law of evidence says: "The mere fact that an advantage would accrue to him from the commission of a crime amounts to nothing, or next to nothing, as a proof of his having committed it. Almost every child has something to gain by the death of a parent, but how rarely is parricide even suspected." 2 Best, Evidence, section 453. Charles Kuhn had made a will naming defendant as sole beneficiary. In this he did only what hundreds of husbands are doing every day without dreaming they are furnishing the state with evidence upon which to convict their widows of murder. His estate did not exceed $1,500, of which, under the law, defendant would have been entitled to one-half in any event. There is not a particle of evidence that she sought or asked or influenced the making of this will. True, it is said she was in the room where it was executed, but it is not shown that she in any manner dictated or interfered with its preparation. This transaction was accompanied by no circumstances casting suspicion upon the defendant, and should be allowed no weight against her. But it is said that, even if this alleged motive be not established, the marriage between defendant and Kuhn was "a loveless union, the bonds of which rested heavily upon her," and we may therefore conclude she was willing to obtain a release therefrom at the cost of murder. In this connection an effort is made to connect her name in a discreditable way with one Andy Smith, but, if this has any more substantial basis than country side gossip and uncharitable inference from acts which are fairly reconcilable with integrity of character and purpose, I am unable to find it in the record. What are the facts upon which the majority of the court reach the conclusion that this defendant cherished "that feeling in her heart for Smith, which, if she were an honest woman, would have been forever obliterated when she spoke her marriage vows"? Smith's father, who says he never saw the woman before her wedding day,

says that he "undertsood" that at sometime before her marriage his son "kept company with her." Other witnesses testify that they saw Smith and defendant together at a Fourth of July celebration a year before her marriage, and he treated her to ice cream.    Defendant herself states that prior to her marriage she was at one time employed at a railroad camp some distance from home; that Smith was also employed in the same neighborhood, and that in starting on her trip to that point she rode with Smith in a buggy to the place where she took the cars for her destination.    This is the "long and mysterious drive" of which we are told in the opinion.  No one states how long it was. Defendant says they drove to a small station near Oskaloosa, but the name of the station she does not remember. The drive was certainly not an extraordinary one.   Smith did not take the train with her.   No witness claims to have seen them on this trip, or to reveal a single fact from which we may even suspect, much less believe, that there was the least impropriety of conduct between them.   No one claims to have seen them at the railroad camp, nor is there any attempt to show that she was not honestly employed there or that she and Smith ever met during that absence from her home.   These petty circumstances constitute absolutely everything upon which to hang the conclusion that defendant's relations to this man before her marriage were of a questionable character.   Nor is the criticism upon their relations after her marriage any better founded.   Smith's father and Kuhn were near neighbors.   Mrs. Kuhn did some sewing for the Smith family, and was frequently at the house; but it does not appear that the young man was always, or even generally, there. Two or three witnesses testify to seeing them in conversation, but, save in a single instance, no one claims to have heard a word that passed between them.   No one testifies to the slighest act of undue familiarity or to any marked indication of affection,—nothing which, but for the necessity

of making the state's case, would excite the faintest suspicion of marital infidelity on defendant's part. The one exception relied upon to reach this unfavorable conclusion is found in the testimony of a woman who claims to have overheard part of a conversation between these persons. On the 6th of August defendant and Smith were seen sitting in the open door of the·barn near the Smith residence. Whether the defendant sought him there, or in passing by saw him, and stopped for an interview, is not shown. The principal witness to this meeting testifies that she was herself at work in a barn or shed not far away, and there heard the words to which reference is made by Justice Waterman. Do those words bear out the unfavorable meaning which is placed upon them? The meeting was in the light of midday, in plain view of the street and of the neighboring houses. There was no appearance of concealment or secrecy. The conversation must have been in ordinary tones for the witness, working in another building, to have been able to hear it. She does not claim to have given it any special attention, and went away leaving them talking. What she heard was a mere fragment of conversation, which, without knowledge of the connection in which the words were spoken, may very readily be misunderstood or misinterpreted. This witness reports no expression or protestation of affection by either for the other, no plot or threat against the husband, no word even of anger or hatred toward him. Giving the words the worst significance of which they are reasonably capable, they show that defendant was foolish enough to talk of her domestic troubles with an outsider. It may readily be conceded that a refined woman, schooled in the proprieties of social life, would not have done it; but lack of refinement or want of education is not a crime, nor is it incompatible with the strictest womanly virtue. In the treatment of this incident, as of nearly every other reference to the history and character of the defendant,

there is in the majority opinion a palpable reversal of the rule which requires us to place upon human conduct and language the most innocent interpretation of which it is reasonably capable.

Passing to the third proposition it is said defendant had the opportunity to put strychnine into the beer drank by Kuhn. What evidence is there of this fact? Here again the state requires us to draw upon our imaginations, for certain it is the evidence is lacking. It is the theory of the state that the fatal bottle of beer was opened by one of the couple as they were driving along the road about half way between What Cheer and Delta. The blue paper found upon the ground the next day is supposed to mark the place where the beer was produced, and 100 feet farther along the route is found the alleged strychnine bottle, empty and corked. The husband and wife were riding side by side in a single-seated buggy, where every act of either was under the immediate eye of the other. To suppose that in driving this 100 feet, or, indeed, any other distance, under those circumstances, the defendant could have produced the bottle of poison, emptied the contents into the beer, recorked the bottle, and cast it away without attracting the attention of her victim is wholly incredible; and yet such is the remarkable theory upon which the verdict of the jury is sought to be sustained. It is unreasonable, and without foundation in the testimony. Much stress is laid upon a conversation between the husband and wife a few evenings before the death of the former. The defendant is the only witness on this point, for, strangely enough, the only other living person who could have thrown any light upon it was not permitted to testify. She tells us, in substance, that she reproached her husband with having deceived her as to his physical condition; that he refused to answer her, and went to call in a neighbor; and that she said to her husband that if he did not answer she had a mind to go away,

and stay with her sister. This is everything the record discloses as to the occurrence referred to and yet from this scanty material it is said there is shown a "motive on the wife's part for the taking of her husband's life    *    *    * in her release from marriage ties which, if ever sacred, had become burdensome to her." But why so? If he had in fact deceived her, she had the right to ask him to explain his conduct. So far as is shown, she did not threaten him, used no language and did no act manifesting a murderous purpose; but here, as elsewhere, we are asked to make up for the lack of proved facts by unfavorable inferences, as we shall more clearly see when we come to consider the exclusion of the testimony of the witness Hiram Smith concerning this occurrence. Upon this principle of construing testimony there need never be a verdict of not guilty in a criminal case. The so-called "dying declarations" of Kuhn will be referred to later in this dissent.

II. The evidence is fatally defective in the entire absence of proof that defendant had poison in her possession which she could have administered to the deceased. The rule of law in cases of felonious poisoning is stated by Greenleaf as follows: "It is sufficient if the jury are satisfied from all the circumtsances and beyond reasonable doubt that death was caused by poison administered by the prisoner. And upon this latter point the material questions are whether the prisoner had any motive to poison the deceased, whether he had opportunity of administering the poison, and whether he had poison in his possession, or power to administer." 3 Greenleaf Evidence (16 Ed.) section 135. Possession by the accused of the means of committing the crime charged is always a matter of prime importance. Burrill, Circumstantial Evidence (2d Ed.) 345. "Not only must it appear that the accused possessed the deadly agent, but it is indispensable to show that he had the oppotrunity of administering it." Wills, Circumstantial Evidence (6th Ed.) 219. In a celebrated

poisoning case—*Reg. v. Graham*, Carlisle Summer Assizes, 1845, cited by Mr. Wills—Baron Rolfe, in his charge to the jury, said: "Had the prisoner the opportunity of administering the poison? That was one thing. Had he any motive? That was another. There is also another question, which is most important. It is whether the party who had the opportunity of administering the poison had the poison to administer. If he had not, then the having the opportunity becomes unimportant." The reasonable and indispensable character of this rule is self-evident. If we may supply this link in the chain of circumstances by a guess, we may supply others by the same easy method, and thus relieve the state of the burden of proof entirely. In McClain, Criminal Law, section 409, it is said that: "Where a chain of facts is relied upon to establish the main fact in issue, each fact in the chain must be proved by competent evidence of the same weight as if the fact were the main fact in issue." The same doctrine, stated in various forms, is found in every standard treatise on the law of crimes. In the case at bar there is not an item of evidence, direct or circumstantial, that the accused ever had strychnine or poison of any kind in her possession. There is no evidence that from the time of her marriage till the hour of her husband's death was she away from the immediate neighborhood of their home. She lived in a small village, and with no large city near at hand. In the range of her opportunity to purchase or obtain the drug every dealer in such article was well known, and all appear to have been placed upon the witness stand, but nothing was traced to the defendant. But it may be asked, "What of the strychnine bottle found by the roadside?" This circumstance well illustrates the dangerous extent to which we must indulge mere conjecture in order to affirm the judgment appealed from. The man who discovered the bottle was not produced, but the driver who was with him supplies all the information we have upon that subject. Charles Kuhn

and wife passed that spot early in the evening, and this bottle was picked up in the afternoon of the next day. No one knows how long it had lain there. The bottle is not traced to the prior possession of any person, nor is the place where or the person from whom it was bought ascertained. It is not for the court or jury to cast upon defendant the burden of showing who did throw away this bottle if she did not. It is enough to know that any one of perhaps scores of persons had the same opportunity of doing it which she had. Fifteen or sixteen hours intervened between the time she passed over the road and the discovery of the bottle. It was a public highway, along which people were frequently passing in either direction. The witness who produces it was himself over the route twice before on that morning,—and these multiplied opportunities by numerous persons to have done the act destroys its value as a circumstance pointing to the defendant as the one responsible for it. It is a matter of common knowledge that strychnine is sometimes purchased by farmers for the destruction of animals and birds which prey upon their crops, by house owners for the destruction of rats and mice, by evil disposed persons for the destruction of dogs, by persons contemplating suicide, and by physicians, who use it in minute quantities as a medicine. By what right, then, shall we say that of all the possible explanations of the presence of this bottle by the roadside the defendant, to whom its possession is not traced, must have placed it there? And yet we are told that the finding of the bottle "is a remarkable circumstance, and entitled to great weight in determining her guilt," and it is argued that she must have dropped it from the buggy, because, "if Kuhn poisoned the bottle of beer in What Cheer, he never carried the vial half way home, and threw it across the buggy, past his wife, to the opposite side of the road to that on which he was riding." To reach that conclusion it is assumed that this bottle must have been in the possession of Kuhn or

his wife, that the poison in the beer was taken from such bottle, and that it was then thrown away by one or the other of them. I am utterly unable to comprehend the power of divination by which this court is enabled to say that the second bottle of beer "was harmless when placed in the defendant's hands," and that "when she passed the bottle back to her husband it contained a deadly poison." Such assumptions are, in my judgment, wholly unauthorized, and destructive of the right of the defendant to have her case considered upon the evidence alone. I think it no exaggeration to say that the effect of the opinion of the court is to take from the state the burden of proving defendant's guilt, and to cast upon her the burden of proving her innocence of the crime. It is said, for instance, "If Charles Kuhn did not commit suicide, murder was done, and defendant must be the guilty party;" and, again, "If this was not suicide, it was murder, and only the wife could have committed it." This places upon the defendant the double burden of negativing her own guilt and affirmatively showing that the death of Kuhn was a case of conscious, voluntary self-destruction It is an established principle that in cases of this kind "it is not enough that the mysteries of the crime cannot be solved from the evidence except upon the supposition of defendant's guilt. The facts proved must be susceptible of explanation upon no reasonable hypothesis consistent with his innocence." 1 McClain, Ciminal Law, section 409. Bearing directly upon this proposition, the case of *Reg. v. Smith*, (2 Irvine Just. Cas. 641), tried before Lord Justice Clerk, also cited by Mr. Wills, furnishes very interesting reading. In that case the defendant, a woman, was shown to have a strong motive for taking the life of the deceased; that she had arsenic in her possession; that she wrote deceased an urgent invitation to visit her on the evening in question, and that immediately after such visit he died of arsenical

poisoning,—an infinitely stronger case than the one before us. Lord Justice Clerk there said to the jury: "You may be perfectly satisfied that the deceased did not commit suicide, and, of course, it is necessary for you to be satisfied of that before you can find that anybody administered of arsenic to him. * * * Yet, on the other hand, gentlemen, keep in view that that will not of itself establish that the prisoner administered it. The matter may remain most mysterious, wholly unexplained; you may not be able to account for it on any other supposition; but still that supposition or inference may not be a ground on which you can safely or satisfactorily find a verdict against the prisoner." As I view it, the decision this court is about to pronounce ignores this rule, and holds, in effect, that defendant may justly be found guilty, not because the evidence is inconsistent with every rational theory of her innocence, but because the mystery which surrounds the death of Charles Kuhn cannot be fully explained except upon the theory of her guilt.

III. The first assignment of error argued by appellant, but not noticed in the majority opinion, appears to me worth our consideration. One Fred Gruber was placed upon the stand by the state, and, after testifying that about the 1st of August, 1900, he had a conversation with Charles Kuhn, he was further examined as follows: "Q. In that conversation, was the subject of his property talked about, without saying what was said? (Defendant objects as incompetent, immaterial, and irrelevant, and hearsay. Overruled. Defendant excepts.) A. Yes, sir. Q. Was his wife, Sarah Kuhn, mentioned or talked about in that conversation, without stating what was said? (Same objection. Same ruilngs. Defendant excepts.) A. Yes, sir. Q. State whether or not the subject of the division of his property between himself and wife was discussed, without stating what was said or how the division was to be made. (Same objection. Same rulings. Defendant

excepts.)  A.   Yes."  That this evidence was inadmissible would seem too clear for argument.  Moreover, it was palpably prejudicial.  The witness was permitted to state the fact of a conversation with the husband in his lifetime, that the wife's name was used, and that the subject of dividing property between husband and wife was there discussed.  Having thus excited the interest and curiosity of the jury, the conversation itself was excluded, and the jurors left to guess or suspect that the division of property was a part of some scheme or plot on the part of the wife.  That this was the real purpose for which the evidence was offered, and the use to which it was effectively put, is manifest from the argument of the attorney general, who says:  "Certainly, the testimony of Gruber was material as the preliminary step in the chain of circumstances to show that deceased was about to make some disposition of his property, and that defendant and her husband had probably discussed this question."  The testimony was rank hearsay, and the damaging character of it is well shown by the quotation just made.  If it leads eminent counsel into the boundless realm of speculation as to what "probably" occurred, how much farther astray may it not have led jurors untrained in the law?

IV.   The exclusion of the testimony of Hiram Smith was error.  This witness, as will be remembered, was called to the Kuhn house on the evening when defendant says she upbraided her husband.  The pertinency of the testimony of this witness can readily be made apparent.  Defendant gave her version of the talk with her husband which led to the calling in of Smith, and testified that when Smith came the trouble was related to him.  In treating of this story upon her part the opinion of the majority says:  "We have no means of knowing the character of this difficulty, except from the wife's statements, but taking that, we must conclude it was graver than she admits.  *  *  *  There was some cause which she does not

give that induced the husband to call in the aid of a neighbor." The court thus casts a doubt upon the truthfulness of the story she tells of that evening's occurrence, and charges her with suppressing some material fact, which it assumes would be to her disadvantage, and yet finds there was no error in excluding the testimony of the only living person other than defendant who knows anything of the truth in this respect. That the witness was called in, that the nature of the trouble between the husband and wife was discussed, there can be no doubt. Smith says he remained there, talking with them, for half an hour. No one can doubt that he there learned from the lips of these parties the situation as it then existed; but every question calculated to develop the truth thus known to him was met with an objection, and the answer excluded. The cross-examination of this witness was grossly unfair. He had already been once upon the stand at the call of the state, and his credibility thus vouched for. Upon the occasion of this examination by the defense he had not been permitted to testify to a single material fact except that he was called in by Kuhn, and talked with him and his wife. There was nothing upon which to base a cross-examination, nor anything upon which to call his character or fairness into question; yet counsel for the state were permitted to proceed in this fashion: "Q. Your son's name was connected with this case, wasn't it? (Defendant objects as incompetent, immaterial, irrelevant and not cross-examination. Overruled, and defendant excepts.) A. I didn't know it the next morning; no sir. Q. You didn't know it the next morning? A. No, sir. (Defendant moves to strike out the last two anwsers as not binding upon this defendant, incompetent, immaterial, irrelevant. Overruled, and defendant excepts.) Q. You were a little anxious about it the next morning? (Same objection, and same ruling, and defendant excepts.) A. Not any more than any man would be in my fix. Q. Having a son

that had had relations with the defendant that your son had had? (Same objection and same ruling, and defendant excepts.) A. Not in that way. Q. When did you hear about what the deceased had said to Snider? (Same objection, same ruling, and defendnat excepts). A. It was the next morning. Q. Didn't say to Snider that morning not to tell what he knew, that you didn't want it to get out, or that in substance? (Same objection, same ruling, and defendant excepts.) A. No." It would be hard, indeed, to find an example more conspicuous for all that a cross-examination ought not to be than is here presented. It has not the least relevancy to anything which the witness had testified in chief. It contains an unjustifiable implication of bad faith in the witness, of a conscious attempt by him to evade or conceal the truth in his own testimony, and to induce another witness to conceal his knowledge of the facts, and assumes as a proved or admitted fact that the defendant had maintained disreputable relations with the witness' son; thus accomplishing the double purpose of casting suspicion upon the integrity of the witness and at the same time aspersing the defendant. Authorities bearing upon the point here made will be found in the following paragraph of this opinion.

V. The cross-examination of the defendant was not limited, as the statute requires, to the matters testified to by her in her examination in chief. Code, section 5485. It has been very properly held by this court that this statute does not exempt a defendant who testifies in his own behalf from the usual tests of credibility. But the usual tests of credibility by cross-examination have never been held to include the right to run at large through a witness' past life, and rake up specific acts of alleged misconduct, and put him on defense of his character in irrelevant matters. The law is not at all doubtful as to what constitutes matter of impeachment, and the state should have been required to show greater respect for defendant's rights in

this regard. In reference to such cross-exaimnations as were indulged in with the defendant and the witness Hiram Smith, the supreme court of Michigan has aptly said: "Zeal in a prosecuting attorney is entitled to the highest commendation, but zeal must be exercised within proper limits. * * * Witnesses are entitled to respectful consideration, and it is the duty of courts to see that they are protected from the insinuations and attacks of counsel, whether the insinuation or attack is direct or is in the form of a suggestive question." *People v. Cahoon,* — Mich. — (5 N. W. Rep. 384). The same court has also said: "When it is manifest that the design or effect of the questions is not to elicit truth, but to cast suspicion upon the character or credit of the witness, courts must intervene, or trials will often result in a miscarriage of justice. The prosecuting attorney had no expectation that respondent would admit he was guilty of the several offenses inquired about. * * * The books are full of cases condemning such practice." *People v. Gotshall* — Mich. — (82 N. W. Rep. 274). To the same effect, see *People v. Crapo,* 76 N. Y. 292 (32 Am. Rep. 302); *Leahy v. State,* — Neb. — (48 N. W. Rep. 390). In *Buel v. State,* — Wis. — (80 N. W. Rep. 78), it is said: "The administration of justice requires that trial courts shall not have their discretionary powers circumscribed by very narrow boundaries, but does require that such limits shall be placed upon them as will prevent any mere prejudice to be built up in the course of a trial which will tend to influence a jury to determine the facts otherwise than from the legitimate evidence produced in court. It is one thing to honestly ask questions on cross-examination for the purpose of discrediting a witness and and quite another to ask questions of a witness who is a party, especially in a serious criminal case for the purpose of injuring his cause in the eyes of the jury, and leading them to believe he was likely, because of his bad character, to have committed the offense charged. A reading of the.

questions under consideration leads to the irresistible conclusion that no idea was entertained by the cross-examiner that proof would be elicited of the matters implied by them. We say 'implied' because the asking of the direct questions in the mnaner in which they were asked implied to some degree that the examiner was possessed of information upon which the questions were based, and, although the answers were in the negative, the bad effect of the insinuation thrown out by the questions was not, and could not have been, entirely removed from the minds of the jurors." See, also, Wharton, Evidence, sections 473, 477.

VI. There was error in the treatment of the so-called "dying declarations" of Kuhn. It is very evident that this testimony was offered as dying declarations within the legal sense of that term. Upon that theory of the offer both state and defendant asked instructions to the jury, but both requests were refused and the jury was instructed simply that if these declarations were made by Kuhn to Snider in the defendant's presence "it is proper to consider the acts and conduct of the defendant at the time such declarations were made by the deceased, together with all the other facts and circumstances established by the evidence, in arriving at your verdict." No other reference whatever is made in the charge of the court to this testimony, which, without doubt, was of great if not decisive weight in bringing about the conviction of the defendant. Now if these statements by Kuhn were to be considered only for the purpose mentioned in the charge then by all means the jury should have been so told and the reqest of the defendant for an instruction that the declarations could not be considered evidence of the fact of the alleged poisoning by defendant should have been granted, and its refusal was error. On the other hand, if such declarations were to be considered, as the majority say, "as tending to show the cause of death, and as a direct charge that defendant was responsible for it," then the jury should have

been specifically and carefully instructed as to what constitutes "dying declarations" within the meaning of the law, and as to the rules governing their consideration and application.   Whether these declarations shall be allowed to go to the jury is first to be decided by the court.   This is done upon a *prima facie* showing, and the ruling which permits the introduction of the evidence is not final or conclusive of the character of the declarations, for that is a question for the jury. 1 McClain, Criminal Law, sections 430, 431; *Starkey v. People*, 17 Ill. 17.   It is therefore the duty of the court to instruct the jury that, before treating these dying declarations as evidence against the accused, the fact must first be found that they were made by Kuhn under a solemn conviction of imminently impending death, when all hope of recovery has been abondoned.  1 McClain, Ciminal Law sections 430, 431; *Starkey v. People*, 17 Ill. 17; *State v. Baldwin*, 79 Iowa, 719; *Bush v. State*, 109 Ga. 120 (34 S. E. Rep. 298); *Smith v. State*, 109 Ga. 227 (34 S. E. Rep. 204); *Martin v. State*, 17 Ohio Cir. Ct. R. 406. The rule which admits dying declarations at all is so exceptional and anomalous, so at variance with the general theory and practice of the courts in applying the law of evidence, that by universal consent it is to be strictly construed in favor of the defendant, and its application guarded by careful instructions. "The danger of sacrificing innocence to too great credulity where human sympathies are wrought upon, and the evidence (a dying declaration) in its very nature must be without the most valuable guaranties of truth, admonishes us that it is better to err in favor of than against life." *Starkey v. People*, *supra*.   The law does not look with favor upon such testimony, and it should be received with great caution.   *State v. Jeswell*, — R. I. — (46 Atl. Rep. 405).   Declarations are at best uncertain evidence, liable to be misunderstood, imperfectly remembered, and incorrectly stated.   *State v. Baldwin*, 79 Iowa, 720; *State v. Perigo*, 80 Iowa, 42.   They are secondary and hearsay, and

are exceptions to the general rule.   *Com. v. Densmore*, 12 Allen, 537; *Digby v. People*, 113 Ill. 125 (55 Am. Rep. 402); *People v. Kraft*, 148 N. Y. 631 (43 N. E. Rep. 80); *Ashton's Case*, 2 Lewin, Cr. Cas. 147.   These cautions apply with double force to the present case, when we recall the circumstances under which the statements of Kuhn were made.   The man was evidently laboring under intense excitement.   There was nothing of the calmness and solemnity which ordinarily marks the person who has given up all hope of life.   Through fear or physical agony he was shouting for help.   The intervals between the spasms which racked his body were too short, and his excitement too great, to permit any connected or logical statement of the alleged poisoning.   It is not impossible that the beer he had drank contributed to his mental confusion.   The witnesses who heard his words were doubtless much excited also, for they do not agree in some essential particulars as to the words Kuhn employed.   From what he did say—even according to the state's version of the statement—it is impossible to say with any degree of certainty whether he was attempting to state the poisoning as a fact of which he had actual personal knowledge, or whether the accusation was simply his earnest belief, based upon other facts and circumstances.   With the jury left to deal at will with testimony of this nature, undirected and uncontrolled by specific instructions, prejudice was sure to follow.

Other questions of importance are raised, but those considered are so controlling that further discussion is unnecessary.

The judgment of the district court should be reversed, and the cause remanded for a new trial.