## STATE v. SWENSON.

A statement made by one who was ill and vomiting, but who had said nothing to indicate that he realized that he was dying, was not admissible as a dying declaration.

A statement by decedent while she was ill and being examined by a physician, and in accused's presence, that accused gave her a drink the night before which made her sick, and she had got worse ever since, was not admissible as part of the res gestae, where accused immediately denied having done so and the evidence conclusively showed that decedent was not ill the night before.

Hypothetical questions must be based upon facts proved or which the evidence tends to prove, and evidence merely that ac-

cused had opportunity to administer partial doses of strychnine to decedent, without any evidence that he had done so, or of illness from the partial doses, does not authorize a hypothetical question to a physician as to the cumulative effect of such partial doses.

The denial by accused of an incriminatory statement made in his presence obviates the effect of such statement as evidence to prove the facts stated.

In a prosecution for murder by strychnine poisoining, a statement by decedent made in accused's presence and while she was being examined by a physician, that accused gave her a drink the night before which made her sick and she had grown worse ever since, was admitted in evidence, though the evidence conclusively showed that decedent was not ill the night before, and without any evidence tending to show that accused had administered partial doses of strychnine to decedent other than the mere fact that he had opportunity to do so. A hypothetical question was allowed based on such statement, as to the cumulative effect of partial doses of strychnine. **Held,** that error in admitting the statement and permitting the hypothetical question based thereon was highly prejudicial to accused.

The appellate court will not disturb the ruling of the trial court in granting or refusing a new trial, except in case of a clear abuse of discretion.

Decedent's knowledge of impending dissolution so as to authorize a statement of the dying declaration may be inferred from his conduct, condition, or statements.

It cannot be said that the trial court abused its discretion in granting a new trial because of the admission in evidence of a statement by decedent that accused poisoned her, if it did not satisfactorily appear to the trial court from the evidence that such statement was made under a sense of impending dissolution; it being admitted as a dying declaration.

(Opinion filed December 6, 1910.)

Appeal from Circuit Court, Clay County. Hon. R. B. TRIPP, Judge.

Nils P. Swenson was convicted of murder, and from the order granting a new trial, the state appeals. Affirmed.

*S. W. Clark, Atty. Gen., Thomas Sterling,* and *Peter Olson,* for the State. *French & Orvis,* for respondent.

SMITH, J. One Nils Swenson, a farmer 72 years old, was convicted in the circuit court of Clay county, upon the charge of murdering Bertha Swenson, his daughter-in-law, by administering strychnine poison. Upon a proper bill of exceptions a new trial

was granted the accused and from the order granting a new trial the state appeals. The motion for a new trial was based upon errors of law occurring at the trial, including errors alleged in certain portions of the charge of the trial court, and upon the ground of insufficiency of the evidence to sustain a conviction. The exceptions to the charge were stricken from the bill by the trial court on the ground that the same were not taken in time, and the order sustaining the motion for a new trial also contains a recital to the effect that the fifth ground of the motion, namely, "that the verdict is contrary to the evidence," was not passed upon or considered by the court in granting the new trial. Upon this record, it seems that the only questions considered by the trial court were those relating to alleged errors of law occurring at the trial in rulings upon the competency of evidence offered. The evidence, which is very voluminous, has been fully and carefully examined by this court, and we are convinced that the trial court exercised a wise discretion in granting the accused a new trial. The bill of exceptions upon the motion for a new trial discloses 42 distinct assignments of error, relating to rulings upon questions of evidence. We shall consider only those assignments which we deem material in determining whether the court was justified in awarding a new trial.

Charles Swenson, son of the accused and husband of the deceased, being called as witness by the state, was asked a certain question which was objected to as incompetent, irrelevant, too remote to be binding upon the defendant, and not a part of the res gestæ, and no proper foundation laid, which objection was overruled and the ruling excepted to by the accused. To understand the materiality of the question presented by this assignment, it is necessary to consider the circumstances of the alleged crime as developed by the evidence on the part of the prosecution. Charles Swenson was the first witness called by the state. He had testified that at the time of the alleged crime, he, together with his wife and three children, were living in his father's house, on his, the defendant's farm, in Clay county; he and his wife being hired by the father to work on the farm. On the 7th day of July,

1909, the day on which the strychnine was alleged to have been administered to the deceased, the witness was at his brother's place, about one-half mile distant, assisting in scraping a ditch; that when the witness left home in the morning to go to his brother's place, the accused, Nils P. Swenson, went with him and remained at the brother's house until about 10 o'clock, when he went east down the road to where Soderberg, another tenant, was cultivating corn, about a half mile. He did not see his father again until he went home for dinner, about 12 o'clock. On arriving home, he put away his team and fed them and went in to dinner, and met his father, who had just finished his dinner, and was coming out of the house as the witness went in. While the witness was eating dinner, the accused came in and called for Bertha, saying something about shutting up some shoats. The deceased, whom the witness had not seen up to that time, since coming home, answered, saying, "Yes, we will shut up the shoats," and came down two or three steps on the stairway, but the witness did not see her face and only saw her feet and dress; that the accused then went away; that after finishing his dinner the witness went out to pump water and do chores about the barn, and was absent about half an hour; that he then went back to the house and went upstairs to see what Bertha was doing. The accused was not in the house when he returned after doing the chores. The witness was intending to go to the field to cultivate corn, but wanted to speak to the deceased before going away, and went upstairs and saw her lying behind the chimney on her back, on a box of cloths. He spoke to her, but she did not answer. She was breathing hard like she was sleeping; her hands were hanging down and her feet were on the floor. When she did not answer the witness took hold of her and raised her up. She started to vomit and vomited quite a little, but did not say a word. She was just like she was dead only she was breathing. He could see she had fainted. Witness then carried her downstairs and laid her on the bed. No one else was then in the room. Shortly after, she came to and said she was awfully sick. The witness got her some water and she drank it later. She asked for water several times.

This was about 2 o'clock in the afternoon. Witness stayed there all day except going off from her a little. The witness thought all afternoon until around 7 o'clock or so, that she was getting better. About two or half past two o'clock, the deceased wanted her husband to get a doctor. He did not say anything in reply at that time. The accused came to the house and the witness told him Bertha was sick. "She wants me to get a doctor." In reply the accused said, "Oh, pshaw, she is just on a spree, on a drunk; she is just drunk." The witness further testified that a week or two previous, the accused and the deceased, Bertha, had sent away and obtained about four gallons of whisky, which was received on the Friday before, and deceased had been drinking; that when the accused told the witness that Bertha was just drunk, Bertha did not answer anything. Accused remained in the room for a short time and then went out. The witness testified that a while after this, his wife again asked him to go for a doctor. He thereupon went to a neighbor's, Carlson's, about a half mile away, and telephoned to Beresford for a doctor and came back home. When he returned, the accused was in the yard. The deceased seemed to be about the same when he came back. She was still and quiet. He did not speak to his wife very much; didn't think she was very sick. She did not say anything further in regard to how she felt. From the time he returned from Carlson's the witness was in the house until Dr. Elliott came, about 6 o'clock that evening; that he met the doctor just outside the door and told him to go in and see what was the matter with Bertha, and the witness went in with him afterwards. The accused was then in the house. The doctor took the temperature of the patient, felt her pulse, and sat down by the bed. They were talking about Bertha's drinking and about her having been over to Soderberg's and Carlson's on Monday, and the deceased then said, "Oh, shut up; that she did not like that." The witness described to Dr. Elliott the condition in which he found his wife and that he carried her downstairs. The doctor was there only about 15 or 20 minutes. The witness was then asked: "Did Bertha say anything about drinking while the doctor was there? A. Yes. Q. Did she say anything in regard to your

father? A. Yes. Q. Now what did she say?" This question was objected to as incompetent, immaterial, and irrelevant, too remote to be binding upon the defendant, not a part of the res gestæ, and no proper foundation laid for it, that such evidence would not be in any way binding upon the defendant, as it could not be anything else but a statement of a transaction that had previously transpired. Objection overruled and defendant excepted. The witness thereupon answered: "Well, she says that Swenson, or father, had given her a drink the night before that made her sick and she kept getting worse and worse." This ruling is assigned as error. The witness testified that the father was present and heard this statement. The question was asked the witness: "Did he [the father] say anything in reply? A. H denied that; said it was not so." The witness testified that he did the chores just after Dr. Elliott left, which took less than an hour and a half; that the accused was in the house when he was doing the chores and was there when he returned to the house; that all of the children were in the house; that Dr. Elliott left some pills with the accused for Bertha, which the accused gave to the witness with directions that one be given every two hours; that about 8 o'clock, the witness put one into her mouth; that the accused went to the bed where Bertha was lying and took a quart bottle containing a little whisky from under her pillow and offered the witness some to drink. Witness took the bottle and tasted it, and it was whisky; that the accused said Bertha had stolen the bottle out of the shanty and hid it there herself. Accused then went upstairs and got two more quart bottles of whisky out of the box where Bertha had been lying. The witness testified that about one-half hour after Dr. Elliott left, the deceased had "one of those shaking spells and said, 'Hold me,' and laid still five or ten minutes, perfectly still." The witness testified that a little after 8 o'clock he went to telephone for the doctor a second time, but that the deceased did not asked him to go for the doctor; that the deceased had a good many shaking spells, but that they were getting kind of slower before he went for the doctor the second time; that when she had those spells her body was kind of stiff and

stretched out, her feet stretched out and hands too, and her head thrown back as she lay there; that it was after 8 o'clock, probably 9, when the witness went to Carlson's to telephone for the doctor the second time and was gone probably 20 minutes; that when he left to go for the doctor only the children were in the house, the father having gone out just after the witness came in from doing chores, and the father had gone to bed in a shanty near by; that the witness on his way returning from Carlson's had called at his brother Oscar's and told them that Bertha was worse, and they came over shortly after; _that on his return from Carlson's the witness found his wife dead, she having died during his absence; that the witness and his brother Oscar went to the house where the father slept, and rapped at the door, but found him in another shanty, a couple of rods farther east, and woke him up. The witness testified that up to the time he went for the doctor the second time, the deceased had been growing worse, that he could see she was weaker, that her shaking spells got less, that she did not shake so hard, that the witness went for the doctor the second time because he thought she was dying. The prosecution then asked the witness the question: "What did you ask her? A. At the very last word? Q. Yes. A. I got from her? Q. Yes." Question objected to as incompetent, irrelevant, too remote to be binding upon the defendant, not a part of the res gestæ, and no proper foundation laid to introduce this as a dying statement or declaration and no proper foundation laid for the question or the answer. The witness was then asked the question: "Was that the last word she said? A. Yes, that was the very last word; yes. I went for the doctor the second time a very few minutes after that." The witness then further answered: "I asked her if it was true that father Swenson, or father, had given her poison? Q. Now, what was her answer? A. 'Yes,' she says; that was all she says." This ruling was excepted to and is assigned as error.

Dr. Elliott, referred to by witness in the foregoing evidence, was called as a witness on behalf of the state and testified that at the time he was getting the history of the case on the occasion of his first visit, the deceased made a remark in the Swedish lan-

guage a little louder than ordinary conversation, which caused the accused, Swenson, to get up off the bench where he was sitting, and reply to it in a manner that perhaps indicated that he was a little indignant. The doctor asked Charles Swenson what his wife had said, and the remark was translated to him as follows: "Father gave me a drink last night that made me sick and I have been getting worse ever since. The father said he did not do it." It appears, therefore, quite conclusively, that the statement of the deceased that the accused "had given her a drink last night that made her sick," was made at a time some hours earlier than that testified to by the witness, Charles Swenson, as having been made "at the very last," and about 8 or 9 o'clock in the evening, when he went to call Dr. Elliott the second time because he thought she was dying. It appears conclusively, from the evidence, that Dr. Elliott was not present when the latter statement was made, and did not return to the house until several hours later. Apparently it is the contention of counsel for the state that both the foregoing statements were made in the course of one and the same conversation with the deceased, but clearly the record does not sustain this contention, and it seems to us that such must have been the view of the trial court in considering the assignments of error upon the motion for a new trial. The two assignments of error therefore appear to require entirely independent consideration.

While the evidence is not as clear and satisfactory as might be desired, it may be assumed that it shows the deceased died of strychnine poisoning. The record, however, is absolutely devoid of any evidence tending to connect the accused with the giving of the strychnine to the deceased, except the two statements made by her, the first in the presence of her husband and Dr. Elliott and the accused, and the second statement made to her husband alone, very shortly before her death.

The first assignment of error which we shall consider, is that relating to the competency of the first of the statements above referred to. There is no evidence whatever that the deceased was ill on the previous evening, to which this alleged statement refers. On the contrary, it quite conclusively appears that she was in her

usual health and attended to her ordinary household duties
throughout the day and evening preceding her death, although the
testimony of her husband discloses that during at least a portion
of that day and the morning preceding her death, she was in a
somewhat despondent mood. It is quite clear that the only possi-
ble relevancy or purpose of this evidence was to show that the
accused, the evening before, did administer poison to the deceased.
The question presented by this assignment of error is whether this
statement, made at the time and under the circumstances disclosed
by the evidence, is competent as tending to prove that the accused
administered strychnine to the deceased. That this statement was
not made under circumstances rendering it competent as a dying
declaration is too manifest to require discussion, and as we under-
stand it, this is not seriously insisted upon by appellant's counsel.

It is, however, quite strenuously urged that the statement is
competent as a verbal act accompanying a medical examination,
and competent as disclosing and characterizing the then physical
condition of the deceased. We are at a loss to understand how
appellant's counsel can consistently make this claim. It must be
presumed that the state when it offered this evidence was cogni-
zant of all the attendant facts and circumstances and knew pre-
cisely what the evidence would disclose, namely, that the deceased
was not ill at any time on the previous day or evening; that she
was in her usual health and in the performance of all her ordinary
household duties, that she had made no complaint of feeling ill,
and had retired with her husband at the usual hour the night pre-
ceding her death, in her ordinary good health. These facts, con-
clusively shown by the record, negative the alleged statement of
deceased that the accused on the evening before her death had
given her a drink which made her sick, and that she had grown
worse ever since. Why the deceased made this statement, if she
did make it, is difficult to understand. It seems to have been a
pure fabrication. It is not enough to say that the jury must have
known the statement to be untrue, and therefore the accused could
not have been prejudiced by it. It further appears in the record
that the state made use of this very statement of deceased in con-

nection with certain hypothetical questions propounded to medical witnesses, and assumed from her supposed illness, as a fact, for the purposes of those questions, that the accused on the evening previous to her death may have given or did give the deceased strychnine. Upon the trial, counsel for the state, presumably to explain the unusual duration of the illness of deceased before its fatal termination caused by a quickly acting poison like strychnine, sought to show the cumulative effect of doses of strychnine, not in themselves sufficient to produce death. Dr. McGlumphy, a witness for the state, was asked this question: "Suppose that at one time there was administered to a person strychnine poison, but not in sufficient quantity to produce death. Suppose that subsequently and after an interval, strychnine poison was again administered, but not at that time in sufficient quantity to produce death, would there be a combined effect of the poison administered in the first place, so that death might be caused?" This question was properly objected to, and the ruling permitting it assigned as error. Unless it be assumed that the accused administered strychnine to the deceased in the drink referred to as given her the evening previous to her death, and again administered strychnine on the day of her death, there is certainly no fact in evidence which would warrant the assumption that cumulative doses of strychnine had been administered to the deceased, and that their combined effect had caused her death.

We cannot agree with the contention of counsel that evidence showing only that accused had opportunities to administer such doses, with no evidence of illness from their effects, is sufficient alone to support such a hypothetical question. It is true that hypothetical questions may be based upon facts proved, or upon facts the existence of which the evidence tends to show, but mere evidence of opportunity to do an act is no evidence whatever, even tending to show that the act itself was done, when standing alone, unaided by any other facts. Illness of the deceased on the evening preceding her death, shown by competent evidence, might have been sufficient, but it was not shown. That there was no evidence of illness clearly appears—in fact, such illness is conclusively nega-

tived by the evidence of the state's own witnesses. The accused was present and heard the statement of deceased, and at once denied it. That such a denial renders the statement incompetent to prove the fact is elementary law. Wigmore on Evidence, § 1072, subd. 4, says: "It ought not to be necessary to note that the parties' denial of the third person's statement destroys entirely the ground for using it." State v. Robinson, 51 La. Ann. 694, 25 So. 380. Nor is such evidence always competent even when the accused remains silent under the charge, and does not deny it. People v. Smith, 172 N. Y. 210, 64 N. E. 814. State v. Dillon, 74 Iowa, 654, 38 N. W. 525, cited by appellant, does not announce any different rule, as it is not shown that the accused denied the statements of the injured man made in his presence.

State v. Kuhn, 117 Iowa, 216, 90 N. W. 733, is not in point as to the question under discussion. In that case the statements were concededly dying declarations and were held to be admissible in rebuttal of the theory of suicide. As dying declarations they were admissible, irrespective of the theory of suicide and being receivable in evidence were competent for the purpose of rebutting the theory of suicide as well as to show the guilt of the accused. The case is authority for the doctrine that dying declarations made in the presence of the accused, which are in effect denials of self-destruction, may be received in evidence to rebut the theory of suicide, on the ground that they are a part of the res gestæ. The effect of the decision is to hold that the declarations were competent both as made in extremis and as part of the res gestæ. The precise sense in which the term "res gestæ" is there used is not very clear. But the general principle is entirely clear. The statements must have been made under such circumstances as to entirely preclude the idea of falsehood through premeditation. And where, as in the case at bar, the evidence of the state shows that the statement itself is not and cannot be true, we can conceive of no possible ground upon which it could be considered competent as part of the res gestæ, and made the basis of hypothetical questions, merely because the words may have been uttered by the deceased. The utterance of statements known to be untrue by

the deceased can be accounted for upon no other hypothesis than that of premeditation and falsehood. That this statement of the deceased, tending to prove one of the facts necessary to be assumed in the hypothetical questions propounded to the medical experts, was gravely prejudicial to the accused before the jury cannot be doubted, and might very reasonably have been the ground on which the new trial was awarded by the trial court. That court had opportunity to observe the use made of all this evidence before the jury, and its probable effect on the question of guilt or innocence of the accused, and this court will not substitute its judgment for that of the trial court upon the question of prejudice.

In Grant v. Grant, 6 S. D. 147, 60 N. W. 743, Mr. Justice Corson stated the principle very clearly: "Ordinarily, in considering a motion for a new trial, in addition to the fact that the trial court has better opportunities for observing the manner of the witnesses in giving their testimony, the demeanor, and peculiar characteristics of the witnesses than the appellate court, there are frequently matters occurring at the trial, that cannot be spread upon the records, that may have an important bearing upon the question of whether or not a new trial should be granted, of which the appellate court has no knowledge. It is in view of these facts that appellate courts do not feel justified in disturbing the decision of the trial court in granting or refusing a new trial, except in a clear case of the abuse of its discretion."

We might rest this decision upon the grounds already indicated, but as the question of the competency of the alleged declaration of the deceased to her husband, shortly preceding her death, as a dying declaration, may arise upon the new trial, it may be briefly considered at this time. It is not clear to us that it was not error to receive this statement as a declaration in extremis. There is no evidence in the record showing with any degree of certainty that the deceased made the statement under the apprehension of impending death. It is true that the fact of impending dissolution may be inferred from the conduct, condition, or statements of the declarant, but the record discloses nothing directly tending to show

such apprehension on her part, unless it be extreme illness alone. The trial court in granting a retrial may have been of opinion that such fact did not satisfactorily appear from the evidence, in which case we cannot say it was clear error or abuse of discretion to grant a new trial. The case of State v. Kuhn, 117 Iowa, 216, 90 N. W. 733, cited by appellant, is not authority for the proposition that one who dies from strychnine poisoning is always apprehensive of impending death, when seized with convulsions which occur in such cases. In that case the court says: "It is in evidence that one fatally poisoned with strychnine is aware, when the convulsions come on, that he is going to die." No such evidence appears in this record. It does appear that the husband of deceased thought his wife was dying when he went to summon the doctor the second time, but no word or act of the deceased appears tending even remotely to show, on her part, consciousness or apprehension of immediate or impending death. Whether this statement of deceased was competent as res gestæ or was mere narrative of a past event, we do not now decide.

Numerous assignments of error in rulings upon evidence are in the record, but as the same conditions may not arise on a new trial, we do not deem it necessary to consider them.

The order granting a new trial is affirmed.