UNITED STATES of America,
Plaintiff-Appellee,

v.

Gary Lee ETHERIDGE, Georgia Etheridge, William Eugene Beard, James Herman Bostic, Sammy Ray Cole, Defendants-Appellants.

Nos. 18909–18913.

United States Court of Appeals,
Sixth Circuit.

April 20, 1970.

Glenn Zell, Atlanta, Ga., for Gary Lee Etheridge and Georgia Etheridge.

Dale Quillen, court-appointed, Nashville, Tenn., for William Eugene Beard.

Thomas C. Binkley, court-appointed, Nashville, Tenn., for James Herman Bostic.

William C. Wilson, court-appointed, Nashville, Tenn., for Sammy Ray Cole.

Alfred H. Knight, III, Nashville, Tenn., for appellee, Charles H. Anderson, U. S. Atty., Alfred H. Knight, III, Sp. Asst. U. S. Atty., Nashville, Tenn., on brief.

Before EDWARDS, McCREE and COMBS, Circuit Judges.

EDWARDS, Circuit Judge.

Five alleged coconspirators in a bank robbery and murder case appeal from their convictions for violations of 18 U.S. C. § 2113 (1964) (the federal bank robbery act) after a lengthy jury trial in the United States District Court for the

Middle District of Tennessee, Nashville Division.

The indictment contained one conspiracy count and seven other counts charging substantive offenses, all of which were alleged in Count 1 as overt acts of the conspiracy.

Count 1 alleged a conspiracy to rob federally insured banks with dangerous weapons and to commit murder to avoid apprehension for same. Gary Lee Etheridge, Georgia Etheridge, William Eugene Beard, James Herman Bostic, John W. Leeman, Sammy Ray Cole, James Richard Self, and James Larry Ferguson were charged on this count.

Count 2 alleged robbery of the Bordeaux branch of the Commerce Union Bank on April 24, 1967. Bostic, Gary Lee Etheridge, Georgia Etheridge, Leeman and Cole were charged on this count.

Count 3 alleged possession of money from the above robbery. Bostic, Gary Lee Etheridge, Georgia Etheridge, Leeman and Cole were charged on this count.

Count 4 alleged the concealment of Bostic, a federal fugitive. Beard was charged on this count.

Count 5 alleged possession of an unregistered sawed-off shotgun. Beard was charged on this count.

Count 6 alleged robbery of the Third National Bank on August 3, 1967. Beard and Self were charged on this count.

Count 7 alleged possession of money from the above robbery. Beard, Self and Gary Lee Etheridge were charged on this count.

Count 8 alleged the murder of Ferguson and charged Gary Lee Etheridge and Beard with committing it.

While the indictment just detailed charged seven persons as codefendants, one of them, Leeman, turned state's evidence and on the government's motion, his trial was severed. The government also moved to sever, and, subsequent to trial, to dismiss Counts 4 and 5.

The jury returned verdicts of guilty as to six codefendants.

Gary Lee Etheridge was found guilty on Counts 1, 2, 3 and 8, and received sentences of 5, 20, 10 and 50 years respectively, to run concurrently. He was found not guilty on Count 7.

Georgia Etheridge was found guilty on Count 1 and received a 4 year sentence. She was found not guilty on Counts 2 and 3.

William Eugene Beard was found guilty on Counts 1, 7 and 8, and was sentenced to terms of 5, 10 and 50 years, respectively, to run concurrently. He was found not guilty on Count 6.

James Herman Bostic was found guilty on Counts 1, 2 and 3, and was sentenced to terms of 5, 20 and 10 years, the sentences under Counts 2 and 3 to run concurrently, but consecutive to the sentence under Count 1.

Sammy Ray Cole was found guilty on Counts 1, 2 and 3, and was sentenced to terms of 5, 15 and 10 years, to run concurrently.

James Richard Self was found guilty on Count 1 and was sentenced to a term of one year. He was found not guilty on Counts 6 and 7.

Defendant Self filed notice of appeal from his conviction on Count 1, but prior to oral argument of this appeal, a motion for dismissal of his appeal was filed jointly by him and the United States Attorney and was granted.

In summary, all five of the appellants were found guilty on the conspiracy count: Gary Lee Etheridge, Bostic and Cole were found guilty on Counts 2 and 3, involving the Bordeaux Bank robbery; Beard was found guilty on Count 7, alleging possession of money stolen in the Third National Bank robbery, and Gary Lee Etheridge and Beard were found guilty of the murder of Ferguson, as alleged in Count 8.

■ Of course, on review of jury verdicts of guilty, we are required to review the evidence from the point of view most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The government's theory in relation to this case, which it supported at trial by a mass of direct, circumstantial and hearsay evidence, was that the defendants formed a conspiracy in the spring of 1967 to engage in various bank robberies and burglaries; that pursuant to this conspiracy, two banks were successfully robbed (the Bordeaux branch of the Commerce Union Bank and the Third National Bank); another bank (the Bank of Orlinda) was broken into in an unsuccessful attempt at burglary; various other crimes such as car theft were committed in the course of the conspiracy; and that the Ferguson murder was committed by two of the coconspirators in order "to avoid apprehension" for the bank robberies because Ferguson had been "talking to the FBI."

Some of the testimony in this lengthy record which the jury could have relied on in reaching its verdicts follows.

John Leeman, the alleged conconspirator turned state's witness, testified pertaining to the robbery of the Bordeaux branch of the Commerce Union Bank:

"Q Did you talk about, with Gary Etheridge, the part that he expected to play in any bank robberies?

"A Yes, sir.

"Q What did he say?

"A He and I decided that going around and sticking them up wasn't no place for us.

"Q And so what was your—what was his thought about how that would be done?

"A We figures we could find somebody to do it for us.

"Q All right, sir. Now what was the first bank that your attention got focused on as a possibility for robbery?

"A Bordeaux.

*      *      *      *      *      *

"A So Ferguson, he was out on his own there, so Gary and I talked about the propositioning him about robbing the bank, and we did, and he accepted.

*      *      *      *      *      *

"Q Now was the idea for him to go in by himself or somebody else with him?

*      *      *      *      *      *

"A We just asked him could he get somebody else, and he said he could.

"Q All right. And who did he get?

"A Bostic.

*      *      *      *      *      *

"Q All right. Now I want to get into —with you, Mr. Leeman, about the plans for robbing that bank that were discussed there at Etheridge's house that day, Friday.

"First, let me ask you about the cars. Let me direct your attention to the cars to be used and ask you what cars were to be used in the robbery?

"A It was a white Cadillac and a GTO Pontiac.

"Q White Cadillac and GTO Pontiac to be used?

"A Yes, sir.

"Q Where did these cars come from?

"A Somebody stole them.

*      *      *      *      *      *

"Q Where were the cars which had been stolen, where were they kept?

"A One of them was at Parkview Hospital.

"Q Which one was that, do you know?

"A The white Cadillac.

"Q The white Cadillac was at the Parkview, all right.

"A The GTO Pontiac was at the old County Hospital in Bordeaux.

*      *      *      *      *      *

"Q All right. Now about these cars, was it a part of the plan to get Ferguson and Bostic over to the cars on Monday morning before the bank was robbed?

"A Yes, sir.

"Q Who was supposed to take them over there?

"A Gary and I took Bostic and Ferguson to the GTO.

"Q All right, sir. Over to the GTO at the County hospital?

"A Yeah.

"Q Now on Friday when you were planning the bank robbery, what was the plan for the bank robbery, to go up to the bank and then how were they supposed to get out of there?

\* \* \* \* \* \*

"Q Where were they supposed to go first, Bostic and Ferguson, after they robbed the bank?

"A Over to the TB Hospital.

\* \* \* \* \* \*

"Q Now what were they supposed to do? Why were they supposed to go to the TB Hospital?

"A To shift automobiles.

"Q To switch automobiles from the Pontiac automobile to the Cadillac automobile?

"A That's right.

"Q And the Cadillac automobile was stored at the TB Hospital, I believe it was left at the TB Hospital for the purposes of switching cars?

"A It had been moved from Parkview to the TB Hospital.

\* \* \* \* \* \*

"Q All right, and did Sammy Ray Cole have any role in this bank robbery, was the plan—

"A He was waiting in the Cadillac up at the TB Hospital.

"Q He was waiting in the Cadillac after the robbery?

"A Yes.

"Q What was he supposed to do?

"A He and Bostic were going to get out down there and jump in the woods.

"Q All right, he and Bostic—in other words, they were supposed to come over to the TB Hospital, switch the Pontiac automobile for the Cadillac automobile?

"A Right.

\* \* \* \* \* \*

"Q Now who was supposed to be in the Cadillac automobile after the switch was made? Who was supposed to be inside that car?

"A Sammy, Bostic and Ferguson.

"Q Sammy?

"A Sammy Cole.

"Q Sammy, Bostic and Ferguson?

"A Yeah.

"Q And who was supposed to be driving it?

"A Sammy drove it, I think. I don't know who drove it, I wasn't up there.

"Q All right, and what were they supposed to do next after they got in that car and started driving, what were they supposed to do next?

"A Coming out of the TB Hospital and took a left, and first street back, they went right, and Cole and Bostic got out and went in the woods and Ferguson went on.

\* \* \* \* \* \*

"Q All right. Then where was Ferguson supposed to go? Was he supposed to keep on going?

"A He went on over to Moormans Arm Road, and on the left there there's a Negro subdivision, and he parked the Cadillac over there. On the other side of the road was a beer joint, and he went—got out of the Cadillac and went over to the beer joint.

\* \* \* \* \* \*

"Q Was any plan about who was supposed to go over and get Ferguson?

"A We planned for Georgia [Etheridge] to go get him.

"Q And what about Bostic and Cole, who were supposed to be up in the woods, what was the plan on that?

"A She was going to pick them up at dark.

"Q All right, sir. Now in the planning of it, were Bostic and Ferguson, when they went in the bank, what were they supposed to be wearing, if anything?

"A Masks, stocking masks.

\* \* \* \* \* \*

"Q Now as part of the plan, was there any agreement on the split of the money?

"A  Yeah, we was going to split the money four ways, at first, and then we decided to split it five ways.

"Q  The original plan was to split the money four ways, and then it was decided to split it five ways?

"A  Yes, sir.

"Q  According to the original plan, who was the money supposed to be split among?

"A  Bostic, Ferguson, Gary and myself.

"Q  And then when it got to be five ways, who was that supposed to be?

"A  Cole.

\*  \*  \*  \*  \*  \*

"Q  Did you know when you went back to Gary's whether or not the bank had been robbed?

"A  I knew it had been robbed.

"Q  How did you know it?

"A  There was a lot of police running around out there.

"Q  A lot of police cars came up?

"A  Yes, sir.

"Q  So then you went back over to Etheridge's house?

"A  Yes, sir.

"Q  So then—who was there when you got back, do you know?

"A  I don't think anyone was.

"Q  Did somebody come in after you got there?

"A  Gary.

"Q  About how long?

"A  Five or ten minutes, I suppose.

"Q  Did anybody else come in?

"A  Georgia with Ferguson.

"Q  About how long was that?

"A  Not long afterwards, five or ten more.

"Q  What did Ferguson, who I believe was called Kingfish, what did Ferguson say had happened, if anything, when they came in?

"A  Said they had robbed a bank.

\*  \*  \*  \*  \*  \*

"Q  All right.  Did he say or indicate anything about whether or not the robbery had gone according to the plan?

"A  Said he thought it had.

"Q  All right, and then what happened after that, after Etheridge got there about five minutes later, and then Georgia comes in with Ferguson, then what happened?

"A  It wasn't long Gary, and Ferguson went to the picture show.

\*  \*  \*  \*  \*  \*

"Q  Now Bostic and Cole at this time, when you went home, and Gary and Ferguson went to the movie, where were they supposed to be?

"A  Hid in the woods.

"Q  And state again for the jury who was supposed to pick them up and what time.

"A  Georgia was going to pick them up about dark.

"Q  All right.  And you say you saw Gary the next time that night, where was that?

"A  Perry Patten's house.

"Q  And what was the purpose of going over there?

"A  Split up the money.

"Q  Who was there?

"A  Me, Gary, Cole, and Bostic, Georgia took Patten and his wife off on the pike up there for something.

"Q  Georgia took Perry Patten's wife out of the house so she wouldn't be there?

"A  Right \*  \*  \*."

Codefendant Beard occasionally worked for a home construction flooring subcontractor.  At trial Beard's employer, Maxie Carney, testified as follows:

"Q  Now, did you have any conversation with Eugene Beard about the Third National Bank robbery?

"A  We discussed it, because it had been robbed recently.

"Q  All right.  What did he say to you about that robbery?

"A  He said that was the way that a bank should be robbed, they just played it cool, just walk in and be firm with them, and said something about you know just cut the camera wire and do it and get it over with in a hurry, but he didn't say he had anything to do with it.

\*      \*      \*      \*      \*      \*

"Q  Did he say anything to you about any money in that connection?

"A  Well, he ended up with twelve hundred dollars.

"MR. QUILLEN: We object to that, that's a conclusion.

"THE WITNESS: Most of the money was turned green.

"THE COURT: Is he stating that as what he said?

"THE WITNESS: Yes, sir, that's what he said.  He said that the money was ruined because there was a—

"Q  Let me ask you this first.  How much money did he tell you he got out of it?

"A  Twelve hundred dollars.

"Q  Now what is this about the money being green?

"A  Said there was a pill in the sack of money was in and it went off and ruined the money.

"THE COURT: Said what? I didn't understand you.

"THE WITNESS: Ruined the money.

"THE COURT: What went off?

"THE WITNESS: Something.

"MR. MERRITT: He said a pill.

"Q  What do you mean by a pill?

"A  I don't know, a bomb, I guess, in the money.

"Q  A bomb went off and what did he say about that?

"A  It turned the money green.

"Q  You mean the money from the bank robbery?

"A  Turned the most of it green.

"Q  Did he tell you how much good money was left?

"A  About two thousand dollars.  He was just wanting to know how to clean the money, how to get the green off of it.

"Q  He was asking you about that?

"A  Yes, sir.

"Q  What did he ask you about that? What was that conversation?

"A  He just asked me if I knew, said he didn't know how, he had tried everything.

"Q  What did you tell him?

"A  I didn't know either.  I told him there ought to be some way, but I didn't know how to do it."

There was testimony by bank employees that such a bomb was placed in the money sack taken from the Third National Bank.

Olympia Linda Letos, who had been traveling with the group, testified concerning Gary Lee Etheridge's role as described by Ferguson just before the attempt to rob the Bank of Orlinda:

"Q  Who was in the room at this time?

"A  Larry Ferguson, Jimmy Jenkins, Eugene Beard, myself, at the time we were talking about this.

\*      \*      \*      \*      \*      \*

"Q  All right.  Linda, to repeat the question what did Larry Ferguson tell you about Gary Etheridge's role in this burglary?

"A  He said that he was the big man in this bank robberies and burglaries, and that's how he said it, that he is the big man over it all, and that he supposedly cased out all the places ahead of time, and he checked to see if there were any policemen patrolling the area, and he let them know the safest time to go in, and just—he looked out for them if they got in any trouble, Larry said that he was the man to get them out no matter what the cost was, just to keep their mouth shut is what he said.

"Q  Did Ferguson or Beard at that time or previously tell you exactly what Gary Etheridge was supposed to do in

connection with this [Bank of Orlinda] burglary?

"A Yes, he was supposed to drive the car and he was supposed to park up the road—"

Miss Letos also described the plan for the Bank of Orlinda robbery and the frustration of its failure:

"Q. All right. And after you had been over there a while, where did you go and who went?

"A We went back to Eugene Beard's room, and everyone—they were preparing to go to Orlinda.

"Q Now who was present in the room at the time you are talking about?

"A Eugene Beard, Jimmy Jenkins, Larry Ferguson, and James Bostic.

"Q Now you say you—they were preparing to go to Orlinda, do you recall what was said about Orlinda, what comments were made that afternoon?

"A Yes, sir. James Bostic said that this bank was a cinch because he gave me the impression that he had been in that area, and knew his way around.

"MR. BINKLEY: Objection to her impression.

"THE COURT: Not the impression, but what he said.

"THE WITNESS: He said he knew a person who tried that bank, but they didn't have those tanks.

"Q Didn't have the tanks—

"A That would go through a nickel head safe.

"Q Do you recall him saying anything about the police situation around Orlinda?

"A Yes, he said there was only one cop—policeman. I'm sorry—patrolling the area, and didn't have to worry about him.

"Q All right. Did they say anything at that time about anybody else who was going to participate in this burglary?

"A Yes, sir, they said that Gary Etheridge was going along, and so would Sammy Cole, and they said that Gary Etheridge was going to sit in the car with one of the walkie-talkies—not directly in front of the bank, but a little ways from it so that he could tell when the policeman drove up close to the bank, he could notify them in case something happened.

"Q Did you at any time while you were up there, did you see Gary Etheridge?

"A Yes, I did. I was sort of nosy, if you want to know the truth, I still—this was all new to me. I saw Gary Etheridge, and Sammy Cole get into their T-Bird that they had there.

\* \* \* \* \* \*

"Q All right. Now do you recall approximately what time James Bostic came back that evening?

"A Yes, it was almost midnight, because they were late getting back, Judy Sineath and James Bostic, because they were supposed to go to Orlinda right at twelve o'clock, they wanted to get there at midnight.

"Q All right. Who left after Bostic got back, who left?

"A Well, before Bostic got back, we, James Jenkins, Larry Ferguson, and Eugene Beard and myself, went down to the car, and this is where I'm confused, I can't remember which car they moved the tanks from, but they moved the tanks out of one of the cars and put it in the other one in the back, one they were going to take with them. They were preparing to go.

"Q. Did you see them when they left for Orlinda?

"A Yes, sir, I did, looked out the window, and Gary Etheridge, Sammy Cole and Larry Ferguson rode in the same car.

"Q What car was that, if you know?

"A His T-bird.

"Q Whose T-bird?

"A Excuse me, Gary Etheridge's T-bird.

"Q And who else went? Who else did you see leave?

"A Eugene Beard, Jimmy Jenkins and James Bostic.

"Q When is the next time you saw Larry Ferguson, James Bostic, Jimmy Jenkins, and Eugene Beard?

"A It was early the next morning, real early the next morning.

"Q What kind of condition were they in when you saw them the next morning?

"A They had mud all over them and poor Larry has lost his shoes.

"Q Larry had lost his shoes?

"A Yeah.

"Q Were they talking to him about that?

"A Yeah, they were kidding Larry, because he had lost his shoes, and he said they were real nice ones, and he had spent quite a bit of money for them.

"Q Did they tell you anything about what had happened to them?

"A Yes, they—Eugene Beard, James Bostic, and Larry Ferguson, Jimmy Jenkins, told me that they had went into the bank, all of them were talking at one time, and that they were getting ready to put the torch on the safe when a light came on upstairs, and then they told me that they heard a voice, Eugene told me this, that he heard a voice upstairs say, we've got you now, and so they said they just ran as fast as they could, and how come they were muddy, because they ran through the mud and it was all messy from the rain the night before."

Appellant Beard testified at trial that he and Ferguson had planned a burglary and planned to pick up a stolen car to use in it on the day Ferguson was murdered.

"Q Now the part that was true, was that you met Ferguson by pre-arrangement out at the Burger Boy, is that right?

"A Yes, sir, I met him out there.

"Q And the reason for meeting him out there was what? I'm not too clear about that. What were you all going to do?

"A Well, he planned—a friend of his worked at a place on Murfreesboro Road, supposed to have some money in it, and we were going to go over there and get it.

"Q Go over there and get it?

"A Yes, sir.

"Q You mean you were going to burglarize the store?

"A Yes, sir.

"Q Who else knew about this?

"A I don't know. Myself and Larry; I don't know who he told.

"Q You don't know who he talked to, you didn't talk to anybody else about it, did you?

"A No, sir, I didn't even know where the place was at."

Several witnesses testified to the dying declarations of Larry Ferguson. He had been shot five times, but escaped from the scene of the shooting and staggered on to the front porch of the home of some people named Watson, where he died from loss of blood. Mr. Watson, a stranger to Ferguson, testified:

"Q The first question you asked him was what? What did you say to him?

"A I said what's your name, boy, and he said, Larry Ferguson.

"Q I see. And what was the next question? Did you ask him another question?

"A I asked him what was the matter with him, and he told me he was shot.

"Q That he had been shot?

"A Yeah.

"Q And what else did you ask him?

"A I asked him who shot him, and he told me who he said shot him.

"Q Who did he say?

"A Eugene Beard.

"Q Said Eugene Beard shot him?

"A Yes, sir, I asked him what about.

"Q Asked him how come, what about?

"A I asked him why did they get into it, and how come him to shoot him, and he said because he knew too much about some bank robbing."

Still another witness, Mrs. John Leeman, testified to the purpose of a hole found near the site where Ferguson was shot:

"Q  Mrs. Leeman, do you recall the morning of Friday, November 3rd?

"A  Yes, sir.

"Q  I'll ask you if Mrs. Etheridge was at your house that morning?

"A  Yes, sir, she was.

"MR. WILSON: What was that date?

"MR. MERRITT: I believe it was Friday, November the third. It was on a Friday.

"Q  Is that right?

"A  Yes, sir.

"Q  On a Friday morning?

"A  Yes, sir.

"Q  Prior to the commencement of the trial of this case?

"A  Yes, sir.

"Q  At that time did Mrs. Etheridge know that your husband was going to testify as a government witness in this case?

"A  No, sir.

"Q  Was he there that morning?

"A  No, sir.

"Q  Would you state to the jury what, if anything, she may or may not have said to you concerning a hole in the ground up in Statesville, Tennessee?

"A  She just said that the hole that was dug up there was for this Larry Ferguson to be put in.

"Q  Was for Larry Ferguson to be put in?

"A  Yes, sir."

Although much of the evidence was disputed at trial (either as to fact or the inferences to be drawn from the facts) as to each of the defendants, there was much additional proof supporting the jury findings. Some of this is summarized below.

A young man named Starks testified to a conversation in May of 1967 wherein Gary Lee Etheridge and Cole sought to recruit him to join in some burglaries.

Jim Allen Freeman testified that during the month of September 1967 Larry Ferguson told him that there was a plan for a bank robbery with some friends of his and asked whether Freeman wanted in on it. Freeman said that Ferguson had identified Leeman and another person named Gary as being among the friends who were involved, and described Gary as "a big man."

Charles Bobo testified that defendant Self told him that he, Self, was in with the people who robbed the Third National Bank.

Officer Donald E. Monday, an officer of the Nashville Metropolitan Police Department at the time of these events, testified to fingerprinting James Self, and a Sergeant James P. Gossett, of the same police department, testified that this fingerprint was identical with a latent print taken from a Pontiac automobile with a Tennessee license plate, JZ 3680, which an eyewitness to the robbery of the Third National Bank had testified was the license plate on the get-away car used in that robbery.

Howard Whitaker testified that he was with defendant Self when Self stole a white Cadillac automobile which Self later told him had been used in the robbery of the Bordeaux Bank.

An FBI Agent Hillin testified that in questioning Beard, Beard told him of a plan formulated in May of 1967 to rob the Thompson Lane branch of the Commerce Union Bank. Hillin testified that Beard indicated that he, Beard, was to be the get-away driver in that bank robbery, but the robbery itself never came off.

A witness named John Vaughn testified that appellant, Beard, a month or so before the murder of Ferguson, told him that Ferguson was "talking too much and had to be taken care of." Vaughn also testified that Beard came by the filling station where he worked the morning of the Ferguson murder and told him that

he had shot five times "at a guy that shot at him." Vaughn also testified that that same Saturday morning Beard said that he was going to "pick up $300 or $400."

A witness named Lloyd Best testified that he had known Beard since he was 10 or 11 years old and that sometime in the early summer, which Best later identified as March or April, Beard told him that "a boy ratted on him and he was going to take care of him." Best also testified that he saw Beard on the Saturday morning of the murder and that Beard told him "I guess the police will pick me up today."

A witness named Eva Coffelt testified that appellant Beard told her in August that Larry Ferguson was trying to frame him and that "Kingfish's days were numbered."

Max Carney, Beard's employer, also testified that Beard told him a month before the Ferguson murder that Ferguson "was going to cause him a lot of trouble by telling everything he knew on him" and that "he had to get rid of him." Carney also testified that at that same time Beard tried to borrow Carney's 30-30 rifle.

Appellant Beard employed Gary Etheridge's Honda for the trip to meet Ferguson on the morning of Ferguson's murder. He left for that trip from Gary Etheridge's house. He called the Etheridge house shortly after the murder had occurred. He returned to the Etheridge house where he was arrested at 3 o'clock that same afternoon.

Charles Bobo testified that while he, Bobo, was in jail, about the middle of September 1967, Gary Etheridge came to the jail and talked to him about killing Ferguson. He testified that there was some mention of a $500 fee and that "it was because he was trying to involve him in some bank robberies, you know, with the FBI."

Coconspirator Leeman testified that he had a discussion with Etheridge about reports that Ferguson was talking to the FBI.

Don Ferguson, the brother of the deceased Larry Ferguson, testified that appellant Beard told him that if his brother (Larry Ferguson) "didn't start cooperating and getting in touch with Gary Etheridge and get in touch with Gary Etheridge or come out to his house, that something was going to happen to him and said that it wouldn't be him that Gary Etheridge—it wouldn't be him or Gary Etheridge that done it, but it would be someone that Gary Etheridge would have do it."

Witness Olympia Linda Letos testified that Gary Etheridge told her that someone had been giving information about banks and he was worried. She said that Etheridge said, "he had an awful lot to lose, and he would blow somebody's head off if they messed him up."

We have indulged in such a complete recital of the facts because we believe it serves to aid materially in answering the legal issues presented by these appeals.

The substantial appellate issues appear to us to be as follows:

1. Under the facts in this case, was Ferguson's murder committed to "avoid apprehension" within the meaning of 18 U.S.C. § 2113(e) (1964)?

2. Did the evidence support the government's theory that the robberies and the murder were part of a single continuing conspiracy?

3. Was Ferguson's dying declaration admissible in evidence?

4. Should the convictions be reversed because of the admission of hearsay evidence?

> *Was Ferguson's Murder Committed in an Attempt to "Avoid Apprehension" Within the Meaning of 18 U.S.C. § 2113(e) (1964)?*

The first and possibly most important issue in this appeal is whether the substantive charge of murder "to avoid apprehension" and the charging of the same events as overt acts in the conspiracy count were authorized by section

2113(e). This appears to be a question of first impression in the federal courts. There are no cases clearly in point and the legislative history does not seem to us to be very enlightening.

■ Section 2113 was originally adopted in 1934 against a background of national concern with interstate operations of bank bandits. It was designed to make it a federal offense to rob federal banks or federally insured banks. Subparagraph (e) was a part of the statute from its inception. It provides:

"Sec. 3. Whoever, in committing any offense defined in this Act, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be punished by imprisonment for not less than ten years, or by death if the verdict of the jury shall so direct." 18 U.S.C. § 2113(e) (1964).

The statutory language itself suggests that part of the congressional purpose was to provide protection to those who aid law enforcement in apprehension of bank robbers, by providing a federal penalty for anyone who kidnapped or killed such a person. Further, the statute clearly envisages making it a federal crime to kill or kidnap anyone in an attempt to escape arrest or imprisonment for bank robbery. This would seem to be evidence that Congress did not intend that a limitation as to remoteness in either time or distance of a murder in an attempt to avoid apprehension be read into the statute.

These observations are particularly relevant to appellants' argument that we should limit the effect of the federal murder penalty to those murders committed "in the course of" robbery of federal banks. By this phrase appellants seek to restrict the murder provision to cover only murders during the robbery or when the law enforcement authorities are in hot pursuit. They point to both a Senate Committee Report, S.Rep.No. 537, 73d Cong., 2d Sess. (1934), and a report of the Attorney General printed in H.R.Rep.No.1461, 73d Cong., 2d Sess. (1934), as employing this language. These reports, of course, do accurately describe the main purpose of the murder provision. They do not, however, contain any language purporting to limit the murder provision only to murders "in the course of" the robbery. If they were read as suggesting such a limitation, both reports would be in square conflict with the language of section 2113(e), which is the plainest sort of statutory language pertaining to murder during escapes. Further, the House Committee Report, H.R.Rep.No.1461, *supra,* on this same legislation employed the much broader phrase "in connection therewith [the robbery]" to describe the murders included within section 2113(e).

Two courts have dealt with and rejected the hot pursuit or "in the course of" argument. In Gilmore v. United States, 124 F.2d 537 (10th Cir. 1942), the Tenth Circuit dealt with a murder of a policeman committed while a convicted bank robber was seeking to escape from jail. The court said:

"It is urged however that in order to constitute an offense under section 3, the killing must accompany and be an incident of the robbery, not follow separately and distinctly in point of time. The statute provides in clear language that where a person kills another either in committing the offense of robbery of a bank, as defined in the act, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing or attempting to free himself from arrest or confinement for such offense, he shall be punished as therein specified. It is to be remembered that these several provisions are in the disjunctive, thus indicating a legislative purpose to make each a separate and distinct offense. Arrest sometimes occurs at the time and place of the commission of an of-

fense. But ordinarily confinement follows separately and distinctly in point of time and place; and in the very nature of things, escape or attempted escape from confinement is generally quite apart in respect of time and place from the commission of the offense for which the person is confined. It therefore is clear that Congress did not intend to restrict the section to instances where murder is committed at the very time of the robbery itself. And it cannot be said that murder committed in attempting to escape from confinement for the offense of robbing a national bank is so unrelated to the offense of the robbery as to fall beyond the legislative reach of Congress to make penal." Gilmore v. United States, *supra* at 540.

In Clark v. United States, 184 F.2d 952 (10th Cir. 1952), a defendant was convicted of bank robbery and of forcing employees to accompany him to avoid apprehension. As against defendant's claim that the "avoid apprehension" language was not Constitutional, the court said:

"Congress having the power to define the offenses in 588b, it also has the power to make it a crime for an offender to avoid apprehension or to escape from arrest or confinement after the commission of the offense. Murder or kidnapping committed in avoiding or attempting to avoid apprehension for robbing a national bank and escape or attempted escape from arrest or confinement for this offense are all interrelated and may not be simultaneous with the robbery. Time and place of the offense is not the constitutional test, but the relation of the offense to the robbery. As was said in Gilmore v. United States, supra [10 Cir., 124 F.2d 540], 'it cannot be said that murder committed in attempting to escape from confinement for the offense of robbing a national bank is so unrelated to the offense of the robbery as to fall beyond the legislative reach of Congress to make penal.' " Clark v. United States, *supra* at 954.

We agree with the Tenth Circuit's interpretation of this statute. We also observe that we can conceive of no reason why Congress, having made bank robbery a federal crime, could not also make it a federal crime to commit murder to avoid apprehension for such a bank robbery.

In dealing with this issue, however, our principal reliance is neither on the House Report nor the Tenth Circuit cases. It is rather upon the common understanding of the language of the statute itself. Congress in our view plainly sought to make it a federal crime to commit murder in order to avoid or to attempt to avoid apprehension for the offense of federal bank robbery. If Congress had intended to limit its prohibition on murder in section 2113(e) to those committed in hot pursuit or murders committed "in the course of" bank-robberies, we believe it could and would have used appropriate language to do so.

We recognize, of course, that it is appropriate to construe criminal statutes strictly and to resolve ambiguities in favor of the defendant. Federal Communications Commission v. American Broadcasting Co., Inc., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954); United States v. Swarthout, 420 F.2d 831 (6th Cir. 1970).

But we find no ambiguity in this statute. Murder "in avoiding or attempting to avoid apprehension for the commission of [the] offense" of federal bank robbery, in our opinion, plainly encompasses the killing of a bank robbery coconspirator to keep him from talking to the FBI and thus causing the apprehension of his fellow bank robbers.

This is exactly what the jury found by its verdicts that Etheridge and Beard had done in this case. The evidence which we have quoted or summarized was competent to support these verdicts.

*Was There a Single Continuing Conspiracy?*

The indictment charged several individuals with joining in a common plan to

commit bank robberies and burglaries. The murder of Ferguson was charged as an overt act of the general conspiracy designed to save the conspirators from apprehension.

Appellants claim that the general conspiracy had terminated before the murder, and that, in any event, the plot to kill Ferguson was an entirely separate conspiracy designed to conceal evidence and should have been charged and tried as such. In this regard appellants rely upon Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), and Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

■ This case, however, is clearly distinguishable from *Krulewitch* and *Grunewald*. In those cases the central object of the conspiracy had clearly been completed. It is "the conspiratorial period [that] lies at the heart of the problem." United States v. Hickey, 360 F.2d 127, 140 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). If the central object of the conspiracy has been accomplished, evidence of subsequent events designed to conceal that accomplishment cannot be presented under the theory that there was an implied conspiracy to conceal the completed crime. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963 (1957).

■ We think, however, that the prosecution alleged and proved a conspiracy to rob and burglarize banks which continued up to and including the date of Ferguson's death. Evidence was presented which tended to show a meeting in September at which another robbery was being planned. Ferguson was killed, and the defendants were apprehended, however, on September 23, before the robbery came to fruition.

■ Further, there is testimony of one coconspirator, Beard, of a plan to employ a stolen car in a burglary on the day that Ferguson was murdered. Indeed, there is no evidence that the conspiracy ended or that any conspirator withdrew from it except as occasioned by arrest by law enforcement officials. A conspiracy, especially one which contemplates a continuity of purpose and a continued performance of acts, is presumed to continue until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn. Hyde v. United States, 225 U.S. 347, 366–367, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); Poliafico v. United States, 237 F.2d 97, 106 (6th Cir. 1956), cert. denied, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957); Continental Baking Co. v. United States, 281 F.2d 137, 155 (6th Cir. 1960); United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, Lessa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); Marino v. United States, 91 F.2d 691 (9th Cir. 1937).

In this case the proofs allowed the jury to find that Gary Lee Etheridge, Georgia Etheridge and Beard knew of the specific plan to kill Ferguson. The jury could have found that appellant Cole was an active participant in conspiracy to rob banks and that he was in close proximity on the day of the murder to the Etheridge house which Beard used as a base for the trip on which the murder occurred. Cole certainly had not withdrawn from the conspiracy.

As to Bostic, although he had been returned to the penitentiary sometime before Ferguson's murder, there is no evidence that he had renounced or withdrawn from the conspiracy.

In United States v. Kissel, 218 U.S. 601, 607–608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910), Justice Holmes stated that "when the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic

series of distinct conspiracies, rather than to call it a single one. \* \* \* A conspiracy is a partnership in criminal purposes. That as such it may have continuation in time is shown by the rule that an overt act of one partner may be the act of all without any new agreement specifically directed to that act."

In Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180 (1946), Justice Douglas, after quoting *Kissel,* went on to explain:

"A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement. But as we read this record, that is not this case." Pinkerton v. United States, *supra* at 647–648, 66 S.Ct. at 1184.

We believe that the quieting of a conspirator, under the facts of this case, was done "in furtherance of the conspiracy," that it fell "within the scope of the unlawful project," and that it could "be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."

Furthermore, Wharton on "Homicide" has stated:

"When men confederate together to commit crimes, of such a nature or under such circumstances as will, when tested by human experience, probably result in taking human life if such necessity should arise to prevent anything from thwarting them, it must be presumed that they all understand the consequences which may reasonably be expected to flow from carrying their plans into effect, and that they assent to the taking of human life if necessary to accomplish their object." Wharton, Homicide 658 (3d ed. 1907).

*See also* Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892).

We conclude that on this record, charging the murder of Ferguson as an overt act under the conspiracy count did not constitute reversible error. The evidence convinces us, as it did the District Judge, that this conspiracy continued until after the murder had been committed. There was evidence that killing of informants was a part of the general plan for operation of the bank robbery ring. There was specific evidence that a number of the coconspirators knew of and participated in planning of the Ferguson murder.

We recognize as to appellants Bostic and Cole that there is no specific testimony that they had knowledge of the plan to do away with Ferguson. But there is ample evidence that they knowingly joined and participated in a conspiracy to commit armed robbery of banks. We conclude that the murder actually committed must be viewed as within the reasonable contemplation of those who formulated and participated in the bank robbey scheme and was in furtherance of the plan.

*The Dying Declaration*

As to the dying declaration of Ferguson, which we have quoted above, the District Judge was well within the discretion vested in him when he admitted it into evidence. Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). Ferguson had been shot five times in the head and body with a .38 caliber pistol. His own statements indicated that he contemplated death and, indeed, he died very shortly after making the declaration.

In ruling the declaration admissible, the District Judge said:

"In this case, all of the facts, as I recall them, as testified to by this witness, proposed witness, are indicative of rationality, rational mind and of a consciousness of impending death with one exception which I will note in a moment.

"First we have the fact that here was a man who was shot five times,

five bullets from a revolver having entered his body. We have the fact that he drove the car up to the house. He blew the horn to get the attention of someone in the house. He got out of the car and leaned over against the car door. He then made his way to the front porch and was able to knock on the door several different times. Then he made the declarations which were attributed to him to the effect that he wanted to make a confession, and I believe some statement to the effect, referring to God or to the Lord, and then he made a statement identifying his assailant, the person who shot him, and then the reason for the shooting. Then he made a statement to the effect that at least open the door and call an ambulance.

"In this pattern of circumstances, the only possible statement that I see that would indicate that the deceased may at that time have had some lingering hope of survival was the statement that he would like for an ambulance to be called. Certainly all of these circumstances taken together would indicate a rational mind, not an irrational mind.

"I find a Missouri case quoted in the footnote in 'Underhill's Criminal Evidence,' 5th Edition, Section 288, page 931, referring to a Missouri case, State v. Evans, 124 Missouri 397, [28 S.W. 8] where it was said:

" 'The mere fact that the victim, while writhing under the torments of a murderous blow, seeks relief from anguish by sending for a physician is not indicative of a hope of life, but a natural desire to be relieved of pain.'

"When I take all of these circumstances together in this case, the reference to the ambulance, I think, could be given no greater significance than the statement in this Missouri case in which the declarant asked for a physician.

"So I am satisfied first that these statements were made at the time when the declarant was of rational mind; secondly that they were made without any hope of survival, that this man had knowledge of the fact that he was going to die, that death was imminent. All of the circumstances together indicate that clearly in my mind."

Like the District Judge, we have no doubt that under the facts of this case the statements previously noted from Ferguson were dying declarations.

As to the admissibility of the opinion or conclusion pertaining to the cause of his murder ("because he knew too much about some bank robbing"), the Supreme Court, speaking through Justice Cardozo, has held:

"The form [of a dying declaration] is not decisive, though it be that of a conclusion, a statement of the result with the antecedent steps omitted. Wigmore, § 1447. 'He murdered me,' does not cease to be competent as a dying declaration because in the statement of the act there is also an appraisal of the crime. State v. Mace, 118 N.C. 1244, 24 S.E. 798; State v. Kuhn, [117 Iowa 216, 90 N.W. 733] *supra*. One does not hold the dying to the observance of all the niceties of speech to which conformity is exacted from a witness on the stand. What is decisive is something deeper and more fundamental than any difference of form. The declaration is kept out if the setting of the occasion satisfies the judge, or in reason ought to satisfy him, that the speaker is giving expression to suspicion or conjecture, and not to known facts. The difficulty is not so much in respect of the governing principle as in its application to varying and equivocal conditions. Shepard v. United States, 290 U.S. 96, 101, 54 S.Ct. 22, 24 (1933).

The section of Wigmore cited with approval by Justice Cardozo contains this additional reasoning:

"*Rule against Opinion Evidence.* The Opinion rule has no application to dying declarations. The theory of

that rule (post, § 1918) is that, wherever the witness can state specifically the detailed facts observed by him, the inferences to be drawn from them can equally well be drawn by the jury, so that the witness' inferences become superfluous. Now, since the declarant is here deceased, it is no longer possible to obtain from him by questions any more detailed data than his statement may contain, and hence his inferences are not in this instance superfluous, but are indispensable." 5 J. Wigmore, Evidence § 1447 at 247 (3d ed. 1940)'.

Although the authorities just cited are not modern, the Supreme Court has recently renewed its adherence to the admissibility of dying declarations. Pointer v. Texas, 380 U.S. 400, 407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). We believe that the statement objected to was within the scope of the dying declaration and that the authorities we have cited support the proposition that its admission did not represent any abuse of discretion by the trial judge.

*Admission of Hearsay Evidence*

Although the briefs of various appellants complain of the prejudicial effect of the District Judge's admission of inadmissible hearsay, little effort was made to point to specific instances of inadmissible and prejudicial testimony.

█ The general rule in conspiracy cases is, of course, that the statements of one of the coconspirators during the course of and in furtherance of the conspiracy are admissible against all coconspirators. Logan v. United States, 144 U.S. 263, 309, 12 S.Ct. 617, 36 L.Ed. 429 (1892); Brown v. United States, 150 U.S. 93, 98, 14 S.Ct. 37, 37 L.Ed. 1010 (1893); United States v. United States Gypsum Co., 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also* 4 J. Wigmore, Evidence § 1079 (3d ed. 1940).

█ We believe that most of the hearsay which was claimed to be objectionable (such as Linda Letos' statements about the Bank of Orlinda bur-glary quoted above) was admissible as to all conspirators on this ground.

█ We recognize that some of the testimony of Judy Farmer pertaining to Bostic's statements to her while plainly made in the course of the conspiracy might be asserted to show no purpose of furtherance of the plan since they pertained to past events. These statements were, however, clearly admissible as to Bostic, since they were claimed to have been made by him and we are satisfied that the District Judge carefully instructed the jury on the proper limitations of use of the statements as to other of the coconspirators.

As to the hearsay issue, we find no reversible error.

Other issues appear to us to require less discussion.

█ The grant or denial of severance of trials or change of venue in a federal criminal case is largely a matter of discretion with the trial judge. Olmstead v. United States, 19 F.2d 842 (9th Cir. 1927), aff'd 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); United States v. Van Buskirk, 304 F.2d 871 (6th Cir. 1962). On the facts of this case we find no abuse of discretion.

█ Appellant Beard's reliance upon Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), is, we believe, misplaced. *Massiah* was questioned by a federal agent after indictment and without waiver of presence of his lawyer (and without even knowledge that he was being interrogated by a federal agent). No such thing happened to Beard. The United States District Attorney at Leeman's request did come to the jail and talk to Leeman. We think that Leeman knowingly and positively waived presence of his lawyer. Beard's protest, of course, is designed to suggest that the government by this process unfairly secured and used information which Leeman had received from his lawyer, who at the time was also representing Beard. This Leeman denied under oath. Nei-

ther Beard nor his lawyer made any showing of actual prejudice. We find no merit in this issue.

We find no other material appellate issues.

We believe that these appellants were accorded a fair trial before a careful and able judge and a very discriminating jury. As we have noted, the jury brought in six not guilty findings in relation to four defendants. As to all of the appellants, there was competent evidence from which the jury could have found them guilty beyond reasonable doubt on all counts where guilty verdicts were returned.

The judgments of conviction are affirmed.